A08A1109. SAVU et al. v. SUNTRUST BANK et al.
(668 SE2d 276)

PHIPPS, Judge.

Sally Rich's great-grandfather, William Prescott, was a director of Trust Company of Georgia during its formative years. As a result of inheritances from him, at the time of her death in 2003 Sally Rich had a custodial account with Trust Company of Georgia's successor, SunTrust Bank, with assets valued at over $45 million. The bulk of her estate passed to her husband Clayton Rich under a marital trust. Upon Clayton Rich's death in 2004, the bulk of his estate passed to their three daughters.

The daughters — Melanie Rich Savu, Sally Rich Kolb, and Lisa Rich Barr — brought this suit charging SunTrust with breach of fiduciary duty. They claim that SunTrust and Ralph Morrison, the trust and estate attorney recommended to Sally and Clayton Rich (the Riches) by SunTrust, failed to advise them to employ well-recognized estate tax savings devices — specifically, a family limited partnership — that could have reduced their estate tax liability from approximately $20 million to about $14 or $15 million. The Rich daughters also complain that after SunTrust recommended Morrison to the Riches, he named SunTrust as executor of their wills and trustee of various testamentary and inter vivos trusts; that after the Riches died, SunTrust in turn employed Morrison to render legal services to the estates; and that this cross-referral arrangement put both Morrison and SunTrust in a conflict-of-interest position that allowed them to charge the estates excessive fees.

The Rich daughters appeal the trial court's grant of SunTrust's motion for summary judgment. Finding an absence of evidence to support essential elements of each of their claims, we affirm.

> To prevail at summary judgment, . . . the moving party . . . ha[s] the burden to demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the nonmovant's favor, warrant judgment as a matter of law. In reviewing the trial court's grant of summary judgment . . . , we must construe the evidence most favorably to [the nonmovant], and we must give [the nonmovant] the benefit of all reasonable doubts and possible inferences. And, where, as here, the moving party . . .

YALE LAW LIBRARY

is the defendant, it need only show an absence of evidence to support an essential element of [the plaintiff's] case to prevail on summary judgment.[1]

Here, the following is undisputed.

William Prescott's bank directorship resulted in a multi-generational relationship between his family and SunTrust. As a result, most of Sally Rich's assets were held in the SunTrust custodial account, and SunTrust provided her with advice in regard to her financial affairs. From the late 1980s until the Riches' deaths, Cathy Stone was their assigned trust officer.

Rocky Lange, a SunTrust vice president with responsibilities as a business development officer, sent the Riches a letter in 1996 encouraging them to upgrade their wills and engage in estate planning. In the letter, he informed them that techniques such as charitable remainder trusts and generation skipping trusts could save them substantial sums in estate taxes; but he stated that the letter was "not intended to be very specific" and recommended that they discuss the advantages and disadvantages of such strategies with their attorney. In his testimony, Lange acknowledged that part of the rationale for suggesting that bank customers employ such devices is to generate fees for providing bank services thereby required.

At Stone's request, the Riches later provided her with copies of their wills for review. Stone thereupon learned that SunTrust had not been named in any fiduciary capacity in their wills. Stone later provided the Riches with a list of SunTrust-recommended attorneys who specialized in large, complex estates; and, in this suit, she acknowledged her awareness of a "strong possibility" that any attorneys recommended by SunTrust would in turn name SunTrust as a fiduciary in any will or trust drafted by such attorney. Names on the list included John Wallace of the King & Spalding law firm and Ralph Morrison of the Jones, Day, Reavis & Pogue law firm.

Wallace corresponded and met with the Riches in late 1998 and early 1999. He proposed that they adopt new estate plans employing estate tax savings devices such as family limited partnerships and generation skipping trusts. In a letter to Sally Rich, he explained that this would entail their execution of new wills that would be vastly more complex than their existing wills. He pointed out that the family limited partnerships were even more complicated than the generation skipping trusts, observing that the complexity surrounding the latter was "child's play" in comparison to the former. But he

---

[1] *Legacy Investment Group v. Kenn*, 279 Ga. 778, 780 (1) (621 SE2d 453) (2005) (punctuation and footnotes omitted).

strongly encouraged them to utilize these devices. In the letter, he explained family limited partnerships as follows:

> This strategy is designed to shift, insofar as you can without a tax, the *increase* in the value of your estates to the children over the upcoming years. You will save tax on that value shift at the rate of 55 percent, which is something well worth considering. Again, please remember the adage that there is opportunity in complexity; if you keep it simple, it means it is a simple thing for the IRS to take more than one-half of your estate.[2]

Wallace testified that the Riches indicated to him that they wanted their daughters to be the executors of their estates, so he did not talk to them about anyone else acting in that capacity. Wallace further testified, however, that although the Riches initially seemed interested in saving money on taxes, they ultimately rejected his advice, primarily because Sally Rich found it all too complicated; and she ultimately informed him that she and Clayton did not need his services.

Later in 1999, the Riches met with Morrison to discuss estate planning. Morrison testified that he, too, advised the Riches on a full range of estate tax savings techniques including the family limited partnership. Morrison testified that he specifically advised them that the bulk of their estates would be subject to estate taxation at a rate of about 50 percent and that their children could thus avoid paying millions of dollars in estate taxes if they transferred a substantial portion of their estates into a family limited partnership; but that both Sally and Clayton were adamantly opposed to use of this device because, in Sally's opinion, it was too complex, would tie her children together for too long, would increase the likelihood of an IRS audit, and would require her to divest herself of control of her assets. Morrison described the Riches' attitude as "ridiculous," because a family limited partnership could have saved the family millions of dollars in estate taxes.

The Riches did, however, decide to use Morrison's services to adopt new wills that incorporated charitable remainder and generation skipping trusts. And they executed such wills in August 1999. In Sally's and Clayton's wills, they appointed each other and SunTrust as co-executors and as co-trustees. The wills also gave either the surviving spouse or a majority of the Rich daughters the power to remove SunTrust as co-executor and substitute another qualified

---

[2] (Emphasis in original.)

bank or trust company. Morrison testified that the Riches were considering using either SunTrust or another entity with connections to one of their daughters as their corporate fiduciary, but that Sally had "pretty much made up her mind" to use SunTrust.

Morrison further testified that he drafted the Riches' wills to provide SunTrust with an entitlement to an executor fee in accordance with its standard fee schedule and that, if he had not done so, SunTrust could have charged a statutory fee quadruple the standard fee amount. Additionally, Morrison testified that it would have been his intent to discuss the executor fee with the Riches if they had any questions about it, but that he did not recall having any discussions with them on this subject. SunTrust's standard fee was based on a percentage of estate assets.

Before the Riches' August 1999 wills and trust documents were finalized, various SunTrust officers, including Stone and SunTrust's in-house counsel, reviewed draft copies because they had to be approved by the bank's acceptance committee before SunTrust could accept a fiduciary appointment. In a memo to one of the bank's committees, Lange noted, "We have had a long standing relationship with Sally and Clayton Rich and have finally gotten them to do some planning and name us in their documents."

The federal estate tax liability triggered by Sally Rich's death in 2003 was only about $850,000, because the bulk of her estate passed to Clayton through a marital trust. The executor fee payable to SunTrust at Sally's death was $392,750. In conformity with its standard practice of employing the attorney who drafted the will to represent it as executor in administering an estate, SunTrust employed Morrison as the attorney representing the executors of Sally Rich's estate.

Morrison's initial fee for representing Sally Rich's, as well as Clayton Rich's, estate was one percent of the fair market value of each estate, as opposed to a fee based on an hourly rate for services rendered — even though, as acknowledged by William Dickson (an officer in SunTrust's estate administration department), the estates, though large, were not legally complex in view of the fact that most of the assets consisted of publicly traded securities in the custodial account. Because, however, the fee was based on a percentage of assets, it came to about $400,000 for each estate. Morrison testified that he did not recall discussing this fee with anyone before Sally's death, because he was not certain that he would become the attorney representing the estates; but that after Sally died, he discussed this fee arrangement with Clayton, who raised no objection to it. In this suit, Morrison acknowledged that for internal law firm accounting purposes, he did compile some time records that probably did not accurately reflect the amount of time he actually spent representing

Sally's estate. Stone acknowledged that she did not know whether anyone at SunTrust had analyzed whether it was in the best interests of the Riches' estates to base Morrison's compensation on a percentage of estate assets rather than an hourly fee.

According to Morrison, an opportunity remained even after Sally Rich's death to achieve substantial estate tax savings due upon Clayton's death by use of a family limited partnership or an analogous family limited liability company. But as pointed out by Dickson, if a family limited partnership so established had been unwound prematurely, the IRS probably would have challenged any discount applied to the value of partnership assets in order to reduce estate taxes due on Clayton's death. Thus, shortly after Sally Rich's death, Morrison wrote Clayton a letter advising him that transfer of assets to a family limited liability company would have a positive estate tax savings effect, but would largely benefit only his children and would "tie up principal." In the letter, Morrison alluded to their discussion of a family limited partnership in 1999.

Dickson testified that after Sally Rich's death, an insurance company proposed an estate tax savings device that would have involved use of funds from the marital trust to purchase insurance policies, but that this proposal was rejected by Morrison, with Dickson's concurrence, because of a letter ruling by the IRS that gift tax liability would have been thereby triggered. Melanie Rich Savu testified that she, too, was concerned about IRS approval and about whether she could have passed the required physical examination. Stone testified that after Sally Rich's death she discussed with Savu and with Morrison establishment of a charitable lead annuity trust as an estate tax savings device, but that Clayton Rich made it clear that he did not want to establish one. Sally Rich Kolb and Lisa Rich Barr testified to the Rich family's rejection of various estate tax savings proposals, specifically including a family limited liability company, after their mother's death. Neither a family limited liability company, a family limited partnership, nor any other additional estate tax savings strategy was adopted.

The federal estate tax due upon Clayton Rich's death totaled over $19 million. After his death, in response to complaints by the Rich family as to Morrison's fee amount, Morrison agreed to reduce his fee to $325,000 for representing Sally Rich's estate and not to charge anything in addition for representing Clayton Rich's estate.

The Rich daughters' expert, John Rodgers, acknowledged that in the banking industry and legal profession, it is common for a bank to refer a customer to a lawyer for the drafting of a will; for the lawyer to then name the bank as executor of the will; and for the bank, in its capacity as executor, to later employ the attorney to render legal services to the estate. Rodgers opined that Morrison would have been

negligent if he had failed to advise the Riches on a family limited partnership or comparable estate tax savings device; he acknowledged, of course, that it still would have been necessary for the Riches to have accepted Morrison's advice in order for such a strategy to have been implemented. Rodgers further acknowledged that a family limited partnership could have been created after Sally Rich's death to reduce estate taxes. Additionally, Rodgers testified that the attorney fees charged for estate representation in this case "were totally out of line considering the nature of the estate and the assets in the estate."

1. The Rich daughters claim that SunTrust put itself in a conflict-of-interest position, by effectively obligating itself to select Morrison as the attorney to represent the estates as a payoff for Morrison's appointment of SunTrust as fiduciary in the Riches' wills. They charge SunTrust with breach of fiduciary duty in paying Morrison an excessive and unreasonable attorney fee for his estate representation work.

They rely on cases such as *Ringer v. Lockhart*,[3] prohibiting a fiduciary from placing itself in a position where its interests might conflict with the interests of the beneficiary of the fiduciary relationship or from making a secret profit from the relationship. They also cite cases such as *Powell v. Thorsen*,[4] holding that the beneficiary need only show that the fiduciary allowed itself to be placed in a position where its interests might conflict with those of the beneficiary.

For the following reasons, however, the evidence here fails to show that SunTrust put itself in such a position. To begin with, there is no real evidence that Morrison recommended that the Riches name SunTrust as co-executor of their wills. Morrison, instead, testified without contradiction that Sally Rich herself made the selection. And it is undisputed that Morrison drafted the Riches' wills to give either the surviving spouse or a majority of the Rich daughters the power to remove SunTrust as co-executor and substitute another qualified bank or trust company. Moreover, while SunTrust made the decision to use Morrison as the estate attorney, Morrison testified, again without contradiction, that Clayton Rich consented to Morrison's selection and to his fee; and, as co-executor of Sally Rich's estate, Clayton Rich had the authority either to veto the decision to hire Morrison or to pay him the percentage fee.

SunTrust's standard practice of employing the attorney who drafted a will to provide legal services in administration of the estate

---

[3] 240 Ga. 82, 84 (239 SE2d 349) (1977).
[4] 253 Ga. 572, 574 (3) (322 SE2d 261) (1984).

is supported by numerous practical considerations, e.g., such attorney has familiarity with the estate and is presumably the attorney whom the testator would select. Therefore, this is a pervasive practice endorsed by a "Statement of General Policies" adopted by the Trust Division of the American Bankers Association and the American Bar Association.[5] It is not prohibited by any ethics rule in Georgia. We do not, however, disagree that the practice raises ethical concerns where it is part of a reciprocal arrangement through which the will draftsman names the bank as estate executor, and the bank then names the will draftsman as estate attorney at a higher fee than that obtainable through negotiation with other qualified lawyers.[6] But the evidence here shows without dispute that the Riches selected SunTrust as fiduciary in their wills; that the wills named Sally and Clayton Rich as co-executors and gave them or their daughters the power to remove SunTrust; and that, after Sally Rich's death, Clayton Rich at least tacitly approved both the selection of Morrison as estate attorney and his fee.

2. The Rich daughters next charge SunTrust in its capacity as co-executor of their parents' wills with breach of fiduciary duty in failing to pursue a legal malpractice claim against Morrison based on his failure to advise the Riches about use of a family limited partnership as an estate tax savings strategy.

The Rich daughters rely on a line of cases imposing a duty on executors "to bring suit and collect every debt due to the testator's estate which they may reasonably expect to recover."[7] Dickson explained SunTrust's failure to bring suit against Morrison through his testimony that it was his understanding that both Wallace and Morrison had presented the Riches with such estate tax savings proposals and that they had rejected them.

As to this, Wallace testified that he advised the Riches about a family limited partnership and that they rejected this proposal because Sally found it too complex. Morrison testified that he made this proposal to the Riches before Sally Rich's death and that, afterward, he made the same proposal again to Clayton Rich, but that the proposal was rejected both times for a number of reasons, including that given by Wallace for the Riches' rejection of his like proposal.

The Rich daughters claim that although there is contemporaneous documentary evidence to show that Morrison suggested other estate savings devices to the Riches before their mother's death,

---

[5] See "An Ethical Analysis of Common Estate Planning Practices – Is Good Business Bad Ethics?" Gerald Johnston, 45 Ohio St. L. J. 57 (1984).

[6] Id.

[7] *Spence v. Phillips*, 172 Ga. 782 (2) (158 SE 797) (1931).

YALE LAW LIBRARY

those documents do not show that a family limited partnership was mentioned. This claim is unsupported by the record, in that the documents relied on by the Rich daughters consist of exhibits to Morrison's deposition that are not in the record. The Rich daughters also claim that although there is contemporaneous documentation of the fact that Morrison suggested use of a family limited partnership to their father after their mother's death, the evidence shows that by that time it was too late for the proposal to be implemented. This claim is contradicted by the record, in that the evidence shows without dispute that a family limited partnership could have been effectively formed after Sally Rich's death although, once formed, it could not have been dissolved for a considerable period of time without the IRS challenging the estate tax discount. And two of the Rich daughters, Sally Rich Kolb and Lisa Rich Barr, verified that after their mother's death the Rich family rejected a number of estate tax savings proposals, including a family limited liability company (an analogue to a family limited partnership). Moreover, Clayton Rich, as co-executor of Sally Rich's will, had co-extensive authority to sue Morrison for legal malpractice; and there is no evidence that he expressed any desire to bring such a suit to SunTrust or anyone else. The evidence thus does not support the claim that SunTrust breached its fiduciary duty by failing to bring such an action against Morrison.

3. Finally, the Rich daughters claim that even before SunTrust began acting as a co-executor, a confidential relationship existed between it and their parents. On this basis, the Rich daughters charge SunTrust with breach of fiduciary duty in failing to advise their parents about a family limited partnership.

> A fiduciary or confidential relationship arises where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc. The party asserting the existence of a fiduciary or confidential relationship bears the burden of establishing its existence. When a fiduciary or confidential relationship is not created by law or contract, we must examine the facts of a particular case to determine if such a relationship exists. . . . Because a confidential relationship may be found whenever one party is justified in reposing confidence in another, the issue of

whether a confidential relationship has been created is ordinarily reserved for the jury.[8]

Generally, there is no confidential relationship between a bank and its customers.[9] Thus, a majority of the Supreme Court of Georgia in *C & S Nat. Bank v. Arnold*[10] held that the purchaser of a mobile home that had been repossessed because it was stolen could not sue the bank for misrepresenting to him that the title was in order, because no relationship existed which would entitle the purchaser to rely upon the bank's representations. Two justices dissented under the rule, as later recognized in cases such as *Stelts v. Epperson*,[11] that "[w]here one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care."[12] In *Merrick v. Mercantile-Safe Deposit &c. Co.*,[13] relied on by the Rich daughters, the Fourth Circuit Court of Appeals held that a trust company, that had provided estate planning advice to the testatrix in consideration of being named the fiduciary under her will and testamentary trusts, could be held liable for negligence in advising her to include in a redrafted will a power of appointment that it had previously determined to be legally ineffective.

Here, the evidence shows without dispute that although SunTrust advised the Riches to engage in estate planning for the purpose of federal estate tax savings, the bank referred them to trust and estate attorneys to determine the specific strategies to be employed. Clearly, therefore, SunTrust did not undertake to advise the Riches on specific strategies and the Riches could not have reasonably relied on SunTrust for such advice. *Merrick* is thus distinguishable; and this case is controlled by cases such as *Robbins v. Nat. Bank of Ga.*[14] and *McCondichie v. Groover*,[15] finding as a matter of law no breach of fiduciary duty.[16]

Thus, the trial court did not err in granting summary judgment to SunTrust on the Rich daughters' claims against it for breach of fiduciary duty.

---

[8] *Yarbrough v. Kirkland*, 249 Ga. App. 523, 527 (2) (548 SE2d 670) (2001) (citations and punctuation omitted).

[9] See *C & S Nat. Bank v. Arnold*, 240 Ga. 200 (240 SE2d 3) (1977).

[10] Id.

[11] 201 Ga. App. 405 (411 SE2d 281) (1991).

[12] Id. at 407 (citation omitted).

[13] 855 F2d 1095 (4th Cir. 1988).

[14] 241 Ga. 538, 542-543 (2) (246 SE2d 660) (1978).

[15] 261 Ga. App. 784, 786 (2) (584 SE2d 57) (2003).

[16] See generally *Bienert v. Dickerson*, 276 Ga. App. 621, 623 (2) (624 SE2d 245) (2005) (claim for breach of fiduciary duty requires proof of existence of fiduciary duty, breach, damages, and proximate cause).

*Judgment affirmed. Barnes, C. J., and Johnson, P. J., concur.*

DECIDED SEPTEMBER 24, 2008.

*Caldwell & Watson, Harmon W. Caldwell, Jr., Harry W. Mac-Dougald, Frederick S. Sugarman*, for appellants.
*Sutherland, Asbill & Brennan, William D. Barwick, Larry J. White, Jamala S. McFadden*, for appellees.