[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12556

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 23, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-01510-CV-1-JEC

STEPHEN D. ATWATER, LETHA
L. ATWATER, Individually and as
Trustee on Behalf of, ATWATER FAMILY
PARTNERSHIP, LTD., STEPHEN D.
ATWATER, JR. IRREVOCABLE TRUST,
MALAYSIA CHANTEL ATWATER
IRREVOCABLE TRUST, PARIS DETRON
ATWATER IRREVOCABLE TRUST,
DIANDRE TARELL ATWATER
IRREVOCABLE TRUST, BLAINE BISHOP,
CARLOS EMMONS, CLYDE SIMMONS,
CJT96 HOLDINGS, INC., AL SMITH,

Plaintiffs-Counter-
Defendants-Appellants-
Cross-Appellees,

MARCO COLEMAN, RAY CROCKETT,
CROCKET 39 FAMILY PARTNERS, LTD.,

Plaintiffs-Counter-
Defendants,

versus

THE NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

                                        Defendant-Third Party-
                                        Plaintiff-Counter-Claimant-
                                        Appellee-Cross-Appellant,

THE NATIONAL FOOTBALL LEAGUE,

                                        Defendant-Appellee.

                    _____

            Appeals from the United States District Court
                for the Northern District of Georgia
                    _____

                        (November 23, 2010)

Before  TJOFLAT, WILSON and EBEL,* Circuit Judges.

EBEL, Circuit Judge:

        The dispositive question presented by this appeal is whether § 301

of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185,

preempts Plaintiffs' state-law claims asserted against the National

Football League ("NFL") and the National Football League Players'

Association ("NFLPA").  Because Plaintiffs' claims arise from or are

---

* Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

substantially dependent upon an interpretation of the terms of a collective bargaining agreement ("CBA"), we conclude those claims are preempted.[1]

## I. Background

Plaintiffs include several former NFL players, the spouse of one of the players, and several investment entities controlled by them. During 2004 and 2005, Plaintiffs invested approximately $20 million with Kirk Wright and Nelson "Keith" Bond, who along with others operated an investment company, International Management Associates ("IMA"). Unbeknownst to Plaintiffs, Wright was actually conducting a Ponzi scheme through which he stole most of the money Plaintiffs invested with IMA. IMA eventually sought bankruptcy relief. Wright was convicted on a number of federal felony charges and thereafter killed himself.

In this litigation, Plaintiffs sued the NFL and the NFLPA, alleging Plaintiffs would not have invested money with IMA had Defendants given them accurate information about Wright, Bond and IMA. More specifically, Plaintiffs complained that the NFLPA listed Wright and Bond with the NFLPA's Financial Advisors Program without first conducting a

---

[1]Plaintiffs, in this appeal, are seeking only the right to pursue their state-law claims. They do not make any claims under §301 of the LMRA. Accordingly, the issue of total preemption is dispositive.

proper investigation.  As for the NFL, Plaintiffs asserted that several Plaintiffs requested, and the NFL provided, background checks on Wright, Bond and IMA that were inadequate.  Based upon these allegations, Plaintiffs invoked the federal courts' diversity jurisdiction, see 28 U.S.C. § 1332, asserting claims against the NFL and NFLPA under Georgia law for negligence, negligent misrepresentation, and breach of fiduciary duty.[2]

The NFL and the NFLPA argued that § 301 of the LMRA preempted Plaintiffs' state-law claims because these claims arose from, or were substantially dependent upon an interpretation of, the CBA between the NFL's Management Council ("NFLMC") and the NFLPA.  According to the NFLPA, its Financial Advisors Program stems directly from the section of the CBA that provides:

> *Section 12.* **Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program.  The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career.  The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

---

[2]Plaintiffs initially also asserted a promissory estoppel claim, but later abandoned it.  And Plaintiffs alleged an independent claim for injunctive relief that was premised on the same allegations supporting the other state-law claims.

4

(Doc. 180, ex. 1 at 80 (2002 CBA Art. LV § 12[3]).) According to the NFLPA, it provides the Financial Advisors Program to its members in an effort to meet the CBA's mandate that the NFLPA provide players with information regarding the handling of their personal finances.

The NFL asserted that it provides background checks on people and companies with whom players and former players are thinking of doing business in an effort to meet its own obligations under the CBA's "Career Planning Program" provision. In addition, the NFL argued that it could not be liable for providing Plaintiffs with any financial information, based upon the CBA's disclaimer that "players shall be solely responsible for their personal finances." (Id.)

Agreeing with the NFL and NFLPA, the district court held § 301 preempted Plaintiffs' state-law claims and, thus, granted Defendants summary judgment on those claims. Plaintiffs appeal from that decision.[4]

---

[3]The 2002 CBA was in effect at the time the events underlying this litigation occurred. This same "Career Planning Program" provision, however, was included in previous versions of the CBA, beginning with the 1993 agreement.

[4]Plaintiff Marcos Coleman was named in the original, but not the amended, complaint. He, therefore, has not participated in this litigation and is not an appellant here. Plaintiffs Ray Crockett and Crocket 39 Family Partners, Ltd., although parties in the district court, also do not join this appeal.

The district court also granted Plaintiffs summary judgment on several counterclaims that the NFLPA asserted against them. The NFLPA cross-appeals from that decision. We have jurisdiction to consider these appeals under 28 U.S.C. § 1291.

## II. Standard of review

This court reviews the district court's summary judgment decision de novo, viewing the evidence in the light most favorable to the non-moving party. See Bartholomew v. AGL Res., Inc., 361 F.3d 1333, 1337 (11th Cir. 2004). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."[5]  Fed. R. Civ.

P. 56(c)(2).

### III.  Summary judgment for the NFL and NFLPA on Plaintiffs' state-law claims

### A.    Preemption under Section 301 generally

In order to insure the uniform interpretation of collective bargaining

agreements throughout the nation, § 301(a) completely preempts state-law

claims, including state tort claims, that require the interpretation or

application of a CBA.[6]  See Lingle v. Norge Div. of Magic Chef, Inc., 486

_____

[5]Citing to the Northern District of Georgia's local rules, the NFLPA argues that this court's review should be limited to the statement of undisputed material facts that the NFLPA submitted to the district court in support of its summary judgment motion.  Local Rule 56.1(B)(2)(a)(2)(i) provides, in pertinent part, that the district court will deem a summary judgment movant's facts admitted "unless the respondent . . . directly refutes the movant's fact with concise responses supported by specific citations to evidence."  The NFLPA contends that, before the district court, "Plaintiffs failed to submit concise responses or admissible evidence in response to the" NFLPA's statement of undisputed facts.  (NFLPA Br. at 12.)  Although the NFLPA made this argument to the district court, the district court did not so limit its consideration of the evidence.  In light of that, neither will we.  See Parker v. Atlanta Newspapers Name Holding Corp., No. 05-15722, 2006 WL 1594427, at *2 n.1 (June 12, 2006 11th Cir.) (unpublished) (per curiam); cf. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1302-03 (11th Cir. 2009) (affording "great deference to a district court's interpretation of its local rules").  In any event, it is not obvious to us that Plaintiffs failed properly to controvert the NFLPA's statement of undisputed facts.  (See Doc. 220 (Plaintiffs' Response to NFLPA's Statement of Material Facts To Which There Is No Genuine Issue To Be Tried).)

[6]Section 301 provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the

(continued...)

7

U.S. 399, 403-06 (1988); Caterpillar Inc. v. Williams, 482 U.S. 386, 388, 392-93 (1987). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law."[7] Caterpillar, 482 U.S. at 393.

The Supreme Court has applied § 301's complete preemption in several cases, including Lingle, 486 U.S. 399, and Allis-Chalmers, 471 U.S. 202. And the Eleventh Circuit has most recently applied § 301 preemption in Bartholomew, 361 F.3d 1333. This authority directs us, in

_____

[6](...continued)
United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Supreme Court has interpreted § 301(a), not only to confer federal-court jurisdiction over such actions, but also to "mandate" that federal courts "fashion a body of federal common law to be used to address disputes arising out of labor contracts[,]" Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 209 (1985), and to apply this federal law to the exclusion of state law, see Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04 (1962).

[7]Complete preemption exists when "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common[-]law complaint into one stating a federal claim.'" Caterpillar, 482 U.S. at 393 (quoting Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65 (1987)); see also United Steelworkers v. Rawson, 495 U.S. 362, 368 (1990) ("[A]ny state-law cause of action for violation of collective-bargaining agreements is entirely displaced by federal law under § 301 . . . ."). The Supreme Court has applied the complete preemption doctrine to only three federal statutes: § 301 of the LMRA, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132, and §§ 85 and 86 of the National Bank Act. See Dunlap v. G&L Holding Grp., Inc., 381 F.3d 1285, 1291 (11th Cir. 2004). The "Court has cautioned that complete preemption can be found only in statutes with 'extraordinary' preemptive force[,]" which "must be manifest in the clearly expressed intent of Congress." Geddes v. Am. Airlines, Inc., 321 F.3d 1349, 1353 (11th Cir. 2003).

determining whether § 301 preempts a state-law cause of action, to consider whether the claim arises from a CBA, see Allis-Chalmers, 471 U.S. at 217, or whether "the resolution of [the] state-law claim depends upon the meaning of a collective-bargaining agreement," Lingle, 486 U.S. at 405-06.[8] If the state-law claim either arises out of a CBA or is dependent upon the meaning of a CBA, "the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute." Lingle, 486 U.S. at 406.

**B.    Section 301 applies here even though the NFL is not a signatory of the CBA**

---

[8]Supreme Court and Eleventh Circuit cases applying § 301 have stated this test in a variety of ways. For example, cases have indicated that § 301 preempts a state-law claim if it "depends upon the meaning of a" CBA, Lingle, 486 U.S. at 405-06; Bartholomew, 361 F.3d at 1338; if the claim is "either founded directly on rights created by a [CBA] or substantially dependent upon an analysis of a" CBA, Darden v. U.S. Steel Corp., 830 F.2d 1116, 1119 (11th Cir. 1987); or the claim "'is inextricably intertwined with consideration of the terms of the'" CBA, Bartholomew, 361 F.3d at 1338 (quoting Allis-Chalmers, 471 U.S. at 213).

As a threshold matter, Plaintiffs argue that § 301 cannot preempt their state-law claims against the NFL because the NFL is itself not a signatory to the CBA.[9]  This argument fails for several reasons.

First and foremost, Plaintiffs do not point out, and we cannot find, where they raised this argument before the district court in defense of the NFL's summary judgment motion.[10]  Moreover, in their initial brief on appeal, Plaintiffs refer to the fact that the NFL is not a signatory to the CBA in only two ambiguous sentences.[11]  They do not appear to argue that preemption should not apply to the NFL because it is not a signatory to the CBA until their reply brief and at oral argument.  That is too late.  For

_____

[9]No party argues that the Supreme Court's recent decision in American Needle, Inc. v. Nat'l Football League, 130 S. Ct. 2201 (2010), is relevant to the issues presented in this appeal. We agree.  In American Needle, the Supreme Court rejected the argument that the NFL's thirty-two separately owned teams and the marketing corporation they created are a single entity for purposes of § 1 of the Sherman Act.  See id. at 2206-08, 2212-17.  The case before us does not present any claims under the Sherman Act.

[10]There were several fleeting references to the fact that the NFL was not a party to the CBA in Plaintiffs' response to the NFL's motion to dismiss, but even there the argument was not developed or clearly asserted.  In any event, we find no reference to this argument in Plaintiffs' response to the NFL's motion for summary judgment.

[11](See Appellants' Br. at 23.)  However, that reference lumps both the NFLPA and the NFL together and because the NFLPA clearly was a signatory to the CBA, this reference does not appear to be advancing an argument that preemption uniquely should not be applied to the NFL because it was not a signatory to the CBA.  In addition, that argument in Plaintiffs' opening brief seems to be directed specifically to the retired Player-Plaintiffs, and that is a different argument than the preemption argument that Plaintiffs raise in their reply brief and at oral argument. Whatever Plaintiffs might have meant in those two sentences, the argument was not adequately developed in their opening brief so as to preserve it on appeal.

10

these reasons, we do not address this belated contention.  See World

Holdings, LLC v. Fed. Republic of Ger., 613 F.3d 1310, 1317 n.12 (11th

Cir. 2010) (claim raised for the first time on appeal); Jackson v. Comm'r

of Soc. Sec., 601 F.3d 1268, 1274 n.4 (11th Cir. 2010) (claim raised for

the first time in a reply brief).

Even if we were inclined to exercise our discretion to address

Plaintiffs' belated argument, on the state of the record before us,

Plaintiffs' argument appears to lack merit.  The copies of the unsigned

CBA that the parties included in the record do suggest that the NFL itself

was not a formal signatory of the CBA.  But that is not dispositive.  The

relevant question for preemption purposes is, instead, whether Plaintiffs'

state-law claims asserted against the NFL would require the court to apply

or interpret the CBA.  See Baker v. Farmers Elec. Coop., Inc., 34 F.3d

274, 277, 282-84 (5th Cir. 1994) (noting, in holding that § 301 preempted

state-law tort claim asserted against employer's manager, that "courts have

governed their determinations on . . . preemption by the necessity of

referring to a CBA for resolution of the claim rather than by the individual

11

status of the defendant[,]" citing cases from the Ninth and Sixth

Circuits).[12]

In any event, the record before us indicates that, although not a

formal signatory, the NFL is bound by the CBA's terms.  The CBA was

entered into between the NFLPA, "which is recognized as the sole and

exclusive bargaining representative of present and future employee players

in the NFL," and the National Football League Management Council,

"which is recognized as the sole and exclusive bargaining representative

of present and future employer member Clubs of the National Football

League."  (Doc. 180, ex. 1 (2002 CBA Preamble), at 5.)  The CBA

explicitly specifies that "all players, Clubs, the NFLPA, the NFL, and the

Management Council" are all bound by the CBA.  (Id. at 8 (Art. II § 1)

---

[12]See also Foy v. Giant Food Inc., 298 F.3d 284, 287, 289 n.4 (4th Cir. 2002) (holding question of whether § 301 preempted a state-law tort claim asserted against a co-worker turned, not on whether he was a signatory to the CBA, but on whether resolution of the claim required interpretation of the CBA); Int'l Union, United Mine Workers v. Covenant Coal Corp., 977 F.2d 895, 895-96, 899-900 (4th Cir. 1992) (holding § 301 preempted state-law claim against non-signatory employer for tortious interference with a CBA); Stringer v. Nat'l Football League, 474 F. Supp. 2d 894, 898-99, 901-02 (S.D. Ohio 2007) (holding nonsignatories to CBA—the NFL, NFL Properties, LLC (which licensed and promoted NFL football equipment), an NFL official and two football equipment manufacturers—could raise § 301 preemption as a defense to plaintiffs' state-law claims); Mullins v. Int'l Union of Operating Eng'rs Local No. 77, 214 F. Supp. 2d 655, 668 (E.D. Va. 2002) (noting, in addressing an employee's tort claims against employer, its president and several co-workers, that § 301 "preempts state law claims against non-signatories where interpretation of the [CBA] is required for resolution"), aff'd, 60 F. App'x 510 (4th Cir. 2003) (unpublished); see also Golden v. Kelsey-Hayes Co., 878 F. Supp. 1054, 1056-57 (E.D. Mich. 1995).

12

(emphasis added).)  And there are numerous provisions in the CBA that specifically reference the NFL or "the League" and set forth explicit rights and obligations of the NFL or the League.[13]  Stringer v. Nat'l Football League, 474 F. Supp. 2d 894, 906 n.8 (S.D. Ohio 2007) (listing obligations of NFL under CBA).  Further, the NFL, in this litigation, has never contended that the CBA's provisions do not bind it.  To the contrary, in its district court pleadings, the NFL identified the NFLMC as "its collective bargaining representative."  (Doc. 185-2 at ¶ 3.)

Given Plaintiffs' failure to develop or timely to argue that §301 preemption should not apply to their claims against the NFL because the NFL is not a formal signatory to the CBA, the foregoing analysis is sufficient for us to accept for purposes of this appeal that the NFLMC, in negotiating the CBA, was acting in an agency capacity for the NFL, and in any event, § 301 preemption may properly be applied to the claims against the NFL.  We therefore proceed to the preemption arguments before us.

C.    **Section 301 preempts Plaintiffs' claims**

---

[13](See Doc. 180, ex. 1 (2002 CBA) Art. IV, Art. V §§ 4, 7, 8, Art. VI §§ 2, 3, Art. IX § 13, Art. XIII §§ 1(a), 3(b), Art. XIV § 5(a), (b), Art. XVI §§ 5, 12, Art. XVII § 3, Art. XIX § 6, Art. XX §§ 6, 7, Art. XXII § 5, Art. L §§ 3, 9, Art. LV §§ 2, 4, 6, 13, Art. LVII § 2, Art. XXIV § 1, Art. XXVI §§ 5, 6, Art. XXVII §§ 5, 6, Art. XXVIII §§ 1, 3, 4, 14, 16, Art. XXX §§ 1-6, Art. XXXVII § 6, Art. XXXVIII §§ 12, 15, Art. XXXVIII-B, § 1, Art. XLIV §§ 5, 6.)

We review de novo whether § 301 preempts a state-law claim. See

Lightning v. Roadway Express, Inc., 60 F.3d 1551, 1556 (11th Cir. 1995).

It is Defendants' burden to establish § 301 preemption. See Williams v.

Nat'l Football League, 582 F.3d 863, 880 (8th Cir. 2009), cert. denied,

2010 WL 1940794 (U.S. Nov. 8, 2010). In determining whether § 301

preempts Plaintiffs' state-law claims, we consider the elements of each of

those claims in turn. See Peterson v. BMI Refractories, 132 F.3d 1405,

1412 (11th Cir. 1998).

## 1. Plaintiffs' negligence claims

Plaintiffs' first state-law claim alleged that both Defendants

negligently investigated Wright, Bond and IMA.

> To state a cause of action for negligence in Georgia, the
> following elements are essential: (1) A legal duty to conform to
> a standard of conduct raised by the law for the protection of
> others against unreasonable risks of harm; (2) a breach of this
> standard; (3) a legally attributable causal connection between the
> conduct and the resulting injury; and (4) some loss or damage
> flowing to the plaintiff's legally protected interest as a result of
> the alleged breach of the legal duty.

Dixie Grp., Inc. v. Shaw Indus. Grp., Inc., 693 S.E.2d 888, 895 (Ga. Ct.

App. 2010) (quoting Bradley Ctr., Inc. v. Wessner, 296 S.E.2d 693, 695

14

(Ga. 1982)).  We focus here solely on the first element, the existence of a legal duty.

### a.    NFLPA

As part of the NFLPA's  Financial Advisors Program, the NFLPA created a list of registered financial advisors.  To be included on this list, an advisor had to apply with the NFLPA, pay a fee and meet the NFLPA's eligibility requirements.  The NFLPA would deny an application if the financial advisor failed to meet all of the eligibility requirements or if a background check indicated that specific judicial or regulatory actions had been taken against the advisor or revealed "[a]ny misrepresentation, material omission, or other evidence of misfeasance or malfeasance," which "may also cause the NFLPA, in its sole discretion, to deem an Applicant unqualified to be a Registered Player Financial Advisor."  (Doc. 180, ex. 2 at 14-15.)

In support of their negligence claim, Plaintiffs specifically alleged that the NFLPA owed them a "duty to exercise reasonable care while performing due diligence background checks on Wright, Bond [and] IMA," a

duty to exercise reasonable care in the evaluation and approval of Wright's and Bond's applications as Registered Financial Advisors under the Program requirements and [a] duty to exercise reasonable care in the monitoring of Wright's and Bond's compliance with the Program requirements while they continued to be registered in the Program.

(Doc. 10 at 27.)

These duties arose directly from the CBA's mandate that "[t]he parties will use best efforts to establish an in-depth, comprehensive Career Planning Program," which would include "provid[ing] information to players on handling their personal finances." (Doc. 180, ex. 1 at 80 (2002 CBA Art. LV § 12).) Undisputed evidence connected the NFLPA's Financial Advisors Program to the NFLPA's efforts to meet its obligations under the CBA to provide such a program. For example, Richard Berthelsen, the NFLPA's general counsel and senior manager, stated that "[t]he Financial Advisors Program is part of the Career Planning Program mandated by the CBA and part of the NFLPA's effort to comply with the CBA's requirement that the NFLPA 'provide information to players on handling their personal finances.'" (Doc. 180, ex. 4 ¶ 14.) NFLPA Director of Player Development Stacy Robinson also indicated that the Financial Advisors Program was part of the Career Planning Program.

16

On appeal, Plaintiffs unsuccessfully attempt to dispute this evidence linking the NFLPA's Financial Advisors Program to the CBA-mandated Career Planning Program in three ways. First, Plaintiffs point to an assertion that the NFLPA made to the Securities and Exchange Commission ("SEC") when the NFLPA was seeking an opinion from the SEC that its Financial Advisors Program would not be subject to SEC regulations pertaining to financial advisors. In distinguishing its Financial Advisors Program, in which participation by both players and advisors is voluntary, from the CBA's mandate that all player agents must be certified by the NFLPA, the NFLPA noted that "financial advisors are not covered by this framework" that applies to contract agents. (Doc. 180, ex. 4, attach. K at 10.) Contrary to Plaintiffs' argument, this statement to the SEC does not address whether the Financial Advisors Program itself arises from the CBA.

Second, Plaintiffs point out that when the NFLPA's Board of Representatives approved the Financial Advisors Program, there was never any mention that it was part of the CBA-mandated Career Planning Program. But that also does not contradict the NFLPA's undisputed

17

evidence linking the Financial Advisors Program to its compliance with the CBA's provision mandating a Career Planning Program.

Finally, Plaintiffs assert that there is no evidence that there is any Career Planning Program at all. But undisputed evidence in the record established that there is. Stacy Robinson stated that "[t]he NFLPA and the NFL have collaborated and jointly developed a host of Career Planning programs and activities," including the coaches intern program for NFL Europe; a "Broadcast Bootcamp" for current and retired players interested in a second career in broadcasting; officiating clinics for current and former players interested in officiating as a second career; a networking program; a pilot program for NFL players transitioning to second careers; an exit symposium for players who have applied for severance benefits, which includes information for players on how to manage their lives after their football careers have ended; and a business and management entrepreneurial program at the business schools of Harvard, Stanford, Penn and Northwestern Universities. (Doc. 180, ex. 7 ¶¶ 7-14.)

In an effort to dispute Robinson's declaration, Plaintiffs presented only the affidavits of Plaintiffs Crockett and Smith stating that they had never heard of the "Career Planning Program." That is not enough to

18

create a factual dispute sufficient to preclude summary judgment. See Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding non-movant's "conclusory assertions" made "in the absence of supporting evidence" are insufficient to withstand summary judgment in face of movant's undisputed relevant evidence).

The district court, therefore, properly held that § 301 preempted Plaintiffs' negligence claim against the NFLPA because the duties underlying that claim arose directly from the CBA. See United Steelworkers v. Rawson, 495 U.S. 362, 369-71(1990) (recognizing "that a state-law tort action . . . may be pre-empted by § 301 if the duty" underlying the tort claim "is created by a [CBA]"); see also Clarke v. Laborers' Int'l Union, 916 F.2d 1539, 1541-42 (11th Cir. 1990); cf. Brown v. Nat'l Football League, 219 F. Supp. 2d 372, 379-83 (S.D.N.Y. 2002) (holding NFL's duty to train its employees properly did not arise from CBA but instead was a duty owed to any member of the public and, therefore, § 301 did not preempt state-law tort claim based upon that duty).

Even if the NFLPA's duty to conduct an adequate background investigation before including an applicant on its list of vetted financial

19

advisors did not arise directly from the CBA's Career Planning Program provision, which it clearly did, a court would still have to consider the CBA's Career Planning Program provision in determining the scope of any duty the NFLPA owed Plaintiffs. Specifically, a court would have to consider the effect of that provision's language, "that players shall be solely responsible for their personal finances," (Doc. 180, ex. 1 at 80), in determining the legal relationship that existed between the parties and their expectations stemming from that relationship. See Williams, 582 F.3d at 880-81; see also Stringer, 474 F. Supp. 2d at 908-11; Holmes v. Nat'l Football League, 939 F. Supp. 517, 527-28 (N.D. Tex. 1996).[14]

[14]The district court treated this language as pertaining to Defendants' defense to Plaintiffs' state-law claims. Circuits are split as to whether a defense, as opposed to a claim, that is substantially dependent on the terms of a CBA compels § 301 preemption. Compare Fry v. Airline Pilots Ass'n, 88 F.3d 831, 838 n.8 (10th Cir. 1996) ("[I]f a CBA must be interpreted to resolve the claim, even if the CBA interpretation is initiated by the defense, the federal or state court must hold the claim preempted by § 301."), Smith v. Colgate-Palmolive Co., 943 F.2d 764, 770-71 (7th Cir. 1991) (noting that, in deciding whether the district court properly entered summary judgment for defendant on § 301 preemption grounds, court can inquire whether plaintiffs' state-law claim is substantially dependent on analysis of a CBA and in doing so is "free to resolve this question by looking beyond the plaintiffs' complaint to the defenses [the defendant] asserts"), and Hanks v. Gen. Motors Corp., 859 F.2d 67, 70 (8th Cir. 1988) (in denying motion to dismiss and remanding for further record development, noting that "[s]hould affirmative defenses attempt to implicate the [CBA], the district court should carefully analyze whether in actuality construction or interpretation of the [CBA] is required in considering such defenses"), with Williams v. Nat'l Football League, 582 F.3d 863, 872-73, 879 & n.1 (8th Cir. 2009) (in addressing summary judgment decisions on merits of § 301 preemption, holding a defendant's defenses are not relevant to determining whether § 301 preempts a state-law cause of action), cert. denied, 2010 WL 1940794 (U.S. Nov. 8, 2010); Ward v. Circus Circus Casinos, Inc., 473 F.3d 994, 996-98 (9th Cir. 2007) (in reversing summary judgment for defendant on

(continued...)

### b. NFL

It is undisputed that the NFL will, at a player's or former player's request, conduct a background check on a potential financial advisor or any other individual or entity with whom a player might do business. In light of that, Plaintiffs alleged that the NFL owed them a "duty to exercise reasonable care while performing due diligence background checks on Wright, Bond [and] IMA." (Doc. 10 at 27.)

The NFL acknowledged in its pleadings before the district court that it performed these background checks as part of the CBA-mandated Career Planning Program.[15] Thus, any duty the NFL owed Plaintiffs to conduct

[14](...continued)
plaintiffs' state-law tort claims, holding "[a] defense based on the CBA is alone insufficient to require preemption"). See generally Williams, 582 F.3d at 879 n.13 (noting that, in the Eighth Circuit, "[w]hen faced with conflicting precedents . . ., [a panel of the Eighth Circuit is] free to choose which line of cases to follow"). We need not address this question here, however, because the language of the Career Planning Program provision of the CBA implicates the necessary elements of Plaintiffs' claims. See id. at 881 (holding § 301 preempted state-law claims alleging negligence and breach of fiduciary duty where CBA's language was relevant to the duty underlying those claims).

[15](See Doc. 185-2 at ¶ 5 ("The broad scope of the protection for which the NFLMC bargained included, but was not limited to, activities conducted, supported by, or promoted through the Career Planning Program, such as background checks by NFL security representatives." (citing to the Declaration of Dennis Curran, NFL Sr. vice president and NFLMC general counsel)); Doc. 185-3 ¶ 6 ("The NFLMC intended for activities supported by or promoted through the Career Planning Program, such as background checks by NFL Security Representatives, to be within the scope of the protection for which it had bargained in Article LV, Section 12" of the CBA (citing Curran's Declaration)); Doc. 185-5 ¶ 9 ("The business inquiries conducted by NFL security representatives are promoted and supported by the Career
(continued...)

21

these investigations with reasonable care arose directly from the CBA. Even if it did not, in determining the scope of any duty the NFL owed Plaintiffs (which is part of Plaintiffs' affirmative case), we would, again, still have to consult the CBA to determine the scope of the legal relationship between Plaintiffs and the NFL and their expectations based upon that relationship, especially in light of the Career Planning Program's language indicating that players were "solely responsible for their personal finances." (Doc. 180, ex. 1 at 80.)

2. **Plaintiffs' negligent misrepresentation claims**

Plaintiffs' second claim against both the NFL and the NFLPA was one for negligent misrepresentation; these claims may be considered together. Under Georgia law, "[t]he essential elements of a claim of negligent misrepresentation are . . . '(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.'" Futch v. Lowndes Cnty., 676 S.E.2d 892, 896 (Ga. Ct. App. 2009) (quoting Hardaway Co. v.

_____

[15](...continued)
Planning Program." (Curran Declaration.)).)

22

Parsons, Brinckerhoff, Quade & Douglas, Inc., 479 S.E.2d 727, 729 (Ga. 1997)).

### a. Negligent supply of false information

The element requiring proof that Defendants negligently supplied Plaintiffs with false information encompasses a claim of negligence which, again, requires proof, among other things, that Defendants owed Plaintiffs a duty. See Newitt v. First Union Nat'l Bank, 607 S.E.2d 188, 196 (Ga. Ct. App. 2004). In support of their negligent misrepresentation claim, Plaintiffs alleged that both Defendants "owed the duty to Plaintiffs to act reasonably and competently in the provision of information to Plaintiffs concerning the background of Wright, Bond, [and] IMA." (Doc. 10 ¶ 93.) In addition, Plaintiffs alleged that the "NFLPA further owed the duty to Plaintiffs to act reasonably and competently in the listing of Wright, Bond[,] and IMA as Registered Financial Advisors in the Program because such information reflected that Wright, Bond[,] and IMA met all program requirements, including that they had adequate insurance coverage." (Id. ¶ 94.)

For the same reasons set forth above, each of these duties arose directly from the CBA's mandate that both the NFL and the NFLPA use

23

"best efforts to establish [the] Career Planning program." (Doc. 180, ex. 1 at 80.) And once again, even if that was not the case, the determination of any duty Defendants owed Plaintiffs to provide information about Wright, Bond and IMA was substantially dependent on, and the scope of the duty will be sculptured by, the language of the Career Planning Program provision of the CBA, and its indication that players were "solely responsible for their personal finances." (Id.)

### b. Plaintiffs' reasonable reliance

Even if Plaintiffs established that Defendants owed them a duty independent of the CBA, which they have not, to recover under a negligent misrepresentation claim, Plaintiffs also had to "show they actually and justifiably relied on the representations" Defendants made regarding Wright, Bond and IMA. Benefit Support, Inc. v. Hall Cnty., 637 S.E.2d 763, 773 (Ga. Ct. App. 2006) (quotation, emphasis, alteration omitted). But here again the determination of whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language indicating that the Career Planning Program "will . . . provide information to players on handling their personal finances, it being understood that players shall be solely

24

responsible for their personal finances." (Doc. 180, ex. 1 at 80 (emphasis added).) That is because, under Georgia law, "the mere presence of [a] disclaimer," regardless of whether or not the plaintiff saw it, can "render [the plaintiffs'] alleged reliance unreasonable." Mitchell v. Ga. Dep't of Cmty. Health, 635 S.E.2d 798, 804 (Ga. Ct. App. 2006) (addressing representations made on website that also contained disclaimers); see also Marquis Towers, Inc. v. Highland Grp., 593 S.E.2d 903, 907 (Ga. Ct. App. 2004) (noting the question of justifiable reliance "depends upon the circumstances under which the report was made"). Therefore, because the court would have to address the disclaimer language in the CBA in order to resolve the reasonable-reliance element of Plaintiffs' negligent misrepresentation claims, § 301 preempts these claims for that reason as well. Cf. Trustees of the Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc., 450 F.3d 324, 331-32 (8th Cir. 2006) (holding § 301 preempted Minnesota claims for fraudulent or negligent misrepresentation because court would have to refer to language of CBA to determine whether Plaintiff was justified in relying on Defendant's alleged misleading statements that may have contradicted CBA's language).

### 3.     Plaintiffs' breach of fiduciary duty claims

Plaintiffs' third state-law claim alleged that both Defendants breached fiduciary duties owed to Plaintiffs.  Under Georgia law, "[e]stablishing a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach."  Paschal v. Fulton-DeKalb Hosp. Auth. Emp. Ret. Plan, 699 S.E.2d 357, 362 (Ga. Ct. App. 2010) (citation and quotation omitted).  Again we focus on the first element, the existence of a fiduciary duty.  Georgia law provides that

> [a] fiduciary or confidential relationship arises where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.  The party asserting the existence of a fiduciary or confidential relationship bears the burden of establishing its existence.  When a fiduciary or confidential relationship is not created by law or contract, we must examine the facts of a particular case to determine if such a relationship exists.

Savu v. SunTrust Bank, 668 S.E.2d 276, 282 (Ga. Ct. App. 2008) (quotation omitted).

In support of this claim, Plaintiffs alleged only that "Defendants have maintained a close and special relationship with each of the Plaintiffs

26

such that Defendants were in a position to, and did, exercise a controlling influence over the will, conduct, and/or interest of Plaintiffs." (Doc. 10 ¶ 101.) Plaintiffs also alleged that "Defendants knew or should have known that Plaintiffs placed confidence and trust in them to exercise the highest standard of care and competence while performing due diligence background checks on Wright, Bond [and] IMA . . . in order to ensure their integrity and fitness as financial advisors to the Plaintiffs." (Id. ¶ 102.) Specifically as to the NFLPA's operation of its Financial Advisors Program, Plaintiffs further alleged that the

> NFLPA also knew or should have known that Plaintiffs placed confidence and trust in them to exercise the highest standard of care and competence in approving the applications of Wright, Bond and IMA for registration as financial advisors under the NFLPA's Program and in monitoring Wright's, Bond's and IMA's continuing compliance with Program requirements for purposes of renewing and/or maintaining Wright's, Bond's and IMA's registration in the Program.

(Id. ¶ 103.)

The fiduciary-duty claims supported by these allegations directly arise from the CBA's mandate that Defendants "use best efforts to establish [the] Career Planning Program," which includes the provision of "information to players on handling their personal finances," (Doc. 180,

27

ex. 1 at 80).  Further, resolution of these claims is substantially dependent on the interpretation of the CBA's language providing that "players shall be solely responsible for their personal finances."  (Id.)  Cf. Schuver v. MidAm. Energy Co., 154 F.3d 795, 799 (8th Cir. 1998) (holding § 301 preempted claim for breach of fiduciary duty because court had to determine whether alleged oral contracts underlying that claim were superseded or contradicted by terms of CBA).

## 4.    The status of some of Plaintiffs as retirees does not change this analysis

Lastly, some of the Player-Plaintiffs argue that, because they were retired at the time they made their ill-fated investments with IMA and thus were not at that time members of the NFLPA's bargaining unit, § 301 cannot preempt their claims, nor the claims of the other investment-entity Plaintiffs which are derived from duties Defendants owed the Player-Plaintiffs.[16]  Although these Player-Plaintiffs remained members of the NFLPA after their retirement, the NFLPA's bargaining unit does not include retired NFL players.[17]  (It appears, furthermore, that

_____

[16]Because Plaintiff Carlos Emmons was an active NFL player at the time he invested with IMA, Plaintiffs do not make this argument as to him.

[17]The NFLPA bargaining unit is limited to players currently employed by an NFL club,
(continued...)

28

Player-Plaintiffs were members of the bargaining unit when the 1993 CBA first containing the Career Planning Program was agreed to or was extended.)

Membership in the bargaining unit, however, is not dispositive of whether § 301 preempts Plaintiffs' state-law claims. Even when retirees are not part of the recognized bargaining unit and thus the union has no continuing obligation to bargain on their behalf, the union and employer can still choose to negotiate benefits for retirees. See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 171 n.11, 181 n.20 (1971). And where they do so, retirees can enforce under §301 a provision in the collective bargaining agreement to provide them with retirement benefits. See id. at 181 n.20; see also Stewart v. KHD Deutz of Am., Corp., 980 F.2d 698, 699-700, 702 (11th Cir. 1993) (recognizing § 301 governed retired employees' claim that CBA precluded employer from modifying their health insurance benefits). In this case, the NFLPA negotiated with the NFL for the CBA's clause

---

[17](...continued)
those who have previously been employed by an NFL club and "who are seeking employment with an NFL Club," all rookie players after they are selected in the draft, and all undrafted rookies once they begin negotiating with an NFL club for employment. (Doc. 180, ex. 1 (2002 CBA Preamble) at 5.)

providing for the Career Planning Program. And no one disputes that the benefits from that program are available to retired as well as current players.[18] Thus, it appears that Plaintiffs could seek to enforce their rights in the Career Planning Program under § 301.

The relevant question, for § 301 preemption is, again, whether the court will be required to interpret or apply the CBA to resolve the retirees' claims. And, as explained above, Plaintiffs' state-law claims arise from the CBA, or are substantially dependent upon the court's interpretation of the CBA. Therefore, § 301 preempts those claims.[19]

## 5. Conclusion as to preemption

For these reasons, we uphold the district court's determination that § 301 preempts Plaintiffs' state-law claims. We, therefore, affirm the district court's decision granting the NFL and NFLPA summary judgment on those claims. In light of that determination, we need not consider

---

[18]No one disputes that the Career Planning Program's services in general, and the Financial Advisors Program and the NFL's background checks in particular, were available to retired NFL players such as these Plaintiffs. These services were among a number of benefits that the CBA provides for former players, including "post-career" medical and dental insurance, an annuity plan, and a retirement plan.

[19]The cases on which Plaintiffs rely to argue to the contrary are inapposite. Most of them involve claims that do not arise out of, and are not dependent upon, a collective bargaining agreement. As we have pointed out previously, Plaintiffs' claims here are dependent upon language in the CBA.

Plaintiffs' challenge on appeal to the alternate basis on which the district court granted the NFLPA summary judgment—that the disclaimer contained in the NFLPA's Financial Advisors Program regulations precluded Plaintiffs' claims against it.

## IV. Summary judgment for Plaintiffs on the NFLPA's counterclaims

The district court granted Plaintiffs summary judgment on the NFLPA's four counterclaims. On appeal, the NFLPA challenges the denial of relief on its second, third and fourth counterclaims.

## A. NFLPA's second and fourth counterclaims

In its second counterclaim, the NFLPA sought indemnification from Plaintiffs Stephen Atwater and Blaine Bishop for the NFLPA's costs in defending this action. This claim was based on allegations both that Atwater and Bishop, during their employment with IMA, became aware of the wrongdoing at IMA but never disclosed that wrongdoing to the other Plaintiffs, and that Atwater and Bishop implicitly agreed to indemnify the NFLPA because they "were contractually bound not to sue or impose any liability on the NFLPA for its operation of the Player Financial Advisors Program," in light of the NFLPA's disclaimers of liability for any acts of the financial advisors listed in its Financial Advisors Program. (Doc. 47

31

at 47-48.) In its fourth counterclaim, the NFLPA sought contribution from Atwater and Bishop "[t]o the extent that the NFLPA is held liable to any of the" Plaintiffs. (Id. at 49.)

After granting Defendants summary judgment on all of Plaintiffs' claims, the district court held that Plaintiffs Atwater and Bishop were entitled to summary judgment on these counterclaims:

> Under Georgia law, liability must be imposed before a right to indemnity or contribution will arise. Because the Court has granted summary judgment in favor of the NFLPA on all of Plaintiffs' claims against it, no liability has been established, and no rights to contribution, indemnity, or attorneys' fees have arisen.

(Doc. 265 at 33 (citations omitted).)

On appeal, the NFLPA only argues, without any supporting authority, that the district court should have dismissed these indemnity and contribution claims as moot rather than granting Plaintiffs summary judgment. The district court, however, did not err in granting Atwater and Bishop summary judgment under these circumstances. See Perling v. Citizens & S. Nat'l Bank, 300 S.E.2d 649, 678 (Ga. 1983) (affirming grant of summary judgment on indemnification claim because underlying claim failed); Emergency Prof'ls of Atlanta, P.C. v. Watson, 654 S.E.2d 434,

32

435 (Ga. Ct. App. 2007) (granting summary judgment to defendants named in contribution and indemnification claims after holding that no contribution or indemnity claim "exist[ed]" because the party seeking to recover was not legally obligated to make the payment for which he sought indemnification and/or contribution); cf. Greenhorne & O'Mara, Inc. v. City of Atlanta, 679 S.E.2d 818, 819, 820 (Ga. Ct. App. 2009) (holding that, where purported joint tortfeasor's liability had been rejected in a previous action, contribution claim failed to state a claim upon which relief can be granted). But see Ga. Power Co. v. Franco Remodeling Co., 525 S.E.2d 152, 153 (Ga. Ct. App. 1999) (holding that, because plaintiff's claims against power company were barred, power company's counterclaim for indemnification was moot).

**B.     Third counterclaim**

"Each member" of the NFLPA "agrees to be bound by the provisions of [the NFLPA] Constitution and by any by-laws, rules or other regulations duly adopted by the NFLPA pursuant to [its] Constitution or as otherwise authorized by law."  (Doc. 180, ex. 3 at 7.)  In its third counterclaim, the NFLPA alleged that Player-Plaintiffs breached Art. 8, § 8.04 of the NFLPA Constitution, which provides: "No member of the

33

NFLPA shall resort to any court or agency outside the NFLPA unless and until he has exhausted all forms of relief provided in this Constitution." (Id. at 21). Citing to Articles 5.02 and 2.11, the NFLPA contends that the Player-Plaintiffs should have submitted, but failed to submit, their claims for consideration to the NFLPA Board of Player Representatives ("the Board"), which legislates for the union.[20]

This court must follow the "plain language" of the NFLPA Constitution and is "bound to accept the interpretation placed on the Constitution by the [union] if it is fair and reasonable." Local 317, Nat'l Post Office Mail Handlers v. Nat'l Post Office Mail Handlers, 696 F.2d 1300, 1302 (11th Cir. 1983). Nonetheless, the district court did not err in determining that these provisions addressing the Board's general

---

[20]Article 5.02 provides generally that the Board of Representatives shall exercise legislative functions:

> Subject to the provisions of the Constitution, the Board of Representatives shall transact the business of the NFLPA. The Board shall have the authority to interpret and apply this Constitution and the legislation of the NFLPA. Such powers, duties and authority not otherwise delegated by this Constitution shall be exercised, acted upon and determined by the Board. Said powers of the Board shall include but not be limited to: enactment of policies governing the affairs of the NFLPA . . . .

(Doc. 180, ex. 3 at 15.) Article 2.11 further provides that "[a]ny person who has been an active player in the NFL by virtue of his signing an NFL contract may join the NFLPA as a retired player member after retiring from football. . . . A representative of the retired-player membership shall be invited to attend regular meetings of the Board of Player Representatives." (Id. at 7-9.)

34

legislative authority did not create "a form of relief" that the Player-Plaintiffs were obligated to exhaust. The NFLPA has failed to establish that the Board, exercising its general legislative authority, could have granted the Player-Plaintiffs the relief they sought on their specific claims alleged in this litigation. And if it could, the NFLPA has further failed to establish that the general language of the provisions of the NFLPA's Constitution on which the union relies informs the Player-Plaintiffs that such a mechanism for relief was available to them and had to be exhausted. The district court, therefore, did not err in granting Plaintiffs summary judgment on this counterclaim.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision in all respects.