[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 28, 2011
JOHN LEY
CLERK

_____

No. 09-10696

_____

D. C. Docket No. 05-22308-CV-WMH

CINDY FILS,
NEMOURS MAURICE,

Plaintiffs-Appellees,

versus

CITY OF AVENTURA, et al.,

Defendants,

THOMAS E. RIBEL, individually and in
his official capacity of Chief of
Police for the City of Aventura
Dade County Florida,
CHARLES CARLANTONE, officer #85-0193,
OFFICER HARVEY ARANGO,
Aventura Police Dept.,
OFFICER JASON WILLIAMS,
Aventura Police Dept.,
SEAN BERGERT, officer #85-0162,
CHRISTOPHER GORANITIS, officer #85-0297,
JEFFREY BURNS, officer #85-0142,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____
(July 28, 2011)

Before TJOFLAT and COX, Circuit Judges, and KORMAN,[*] District Judge.

TJOFLAT, Circuit Judge:

This case involves claims of excessive force against local police officers under 42 U.S.C. § 1983, and the officers' corresponding assertion of qualified immunity. The officers moved for summary judgment based on this defense in the district court, and the court denied their motion. They then appealed to this court. We unfortunately found ourselves unable to decide the case, and issued a limited remand to the district court to clarify its opinion. It has done so, and we are now in a position to render a decision.

I.

A.

The initial sequence of events is not in material dispute. On August 23, 2003, Cindy Fils and Nemours Maurice (the "Plaintiffs") attended a party together at Broadway Billiards (the "club") in Aventura, Florida. Maurice knew the party's

_____

[*] Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

2

promoter. Although the record shows that Maurice assisted the promoter in pre-party logistics, Maurice's clothing did not suggest that he was involved with the party in any official capacity.

The Plaintiffs arrived at the club sometime after midnight and remained at the party without incident for a few hours. This relative peace was disturbed when a female partygoer began making a commotion inside the club. She was yelling and complained that a male partygoer had assaulted her. In an attempt to assist the promoter, Maurice escorted the female partygoer out of the club, where he knew that two police officers for the City of Aventura (the "City")—Defendant Jason Williams and a non-defendant officer—were stationed. The female partygoer willingly exited with Maurice, but was screaming—"hysterically," according to Maurice—about the alleged assault.

The female partygoer approached the officers, still screaming. Reports conflict, but it appears that the female partygoer charged (or made some other menacing gesture) toward Williams and the non-defendant officer. In response, the non-defendant officer arrested the female partygoer, in the process physically throwing her to the ground.[1] A friend of the female partygoer took issue with this treatment and advanced toward the officers. After instructing the friend to stop

_____

[1] While reports conflict as to how the female partygoer was incapacitated, this issue has no bearing on the outcome of this case.

3

moving—and seeing that instruction ignored—one of the officers shot the friend with his taser.[2]  The officers called for backup.  Shortly, four more officers—Defendants Sean Bergert, Jeffrey Burns, Harvey Arango, Charles Carlantone, and Christopher Goranitis (collectively, along with Williams, the "Defendants")—arrived at the scene.[3]

It is at this point that the Plaintiffs' and the Defendants' version of events diverge.  Descriptions of the scene vary wildly depending on the storyteller.  Maurice and Fils describe the scene outside the club as "calm," though many people were talking about the two arrests, with roughly fifteen to twenty people outside the club.  The Defendants and a witness, Nerlange Cineus, describe the scene as far more chaotic, and estimate the crowd to have reached up to forty-five people.

1.

---

[2]  A "taser" is a non-deadly weapon commonly carried by law enforcement.  The taser administers an electric shock to a suspect by shooting two small probes into the suspect's body.  The probes are connected to the firing mechanism via wires.  Once fired, the probes lodge under the suspect's skin and administer an electric shock.  This type of taser permits the officer to incapacitate a suspect from a modest distance.  We refer to this type of taser when we say that someone was "tased."  For a useful explanation of the origin of the term "taser," see Reiff v. Marks, No. 08-CV-5963, 2011 WL 666139, at *2 n.20, *2 n.23 (E.D. Pa. Feb. 23, 2011).

Police also use a second type of taser that does not shoot probes into the suspect from a distance.  Rather, this taser must make physical contact with the suspect's body.  We refer to this taser as a "contact taser," and to any application of this weapon as a "contact tase."

[3]  The record suggests more officers were on the scene; some reports suggest as many as ten officers were eventually outside the club.

4

We start first with Maurice's version of his encounter with the Defendants. Following the two arrests,[4] Maurice and Fils decided to leave. Maurice first sought out his friend, the promoter, who was standing at the entrance to the club. Maurice and the promoter spoke for a few minutes, with Maurice's back facing the parking lot where the arrests had occurred. During this conversation, Maurice stated—in what he characterized as a normal tone of voice—"they're overreacting, these motherfuckers are overreacting." It is safe to infer that these "motherfuckers" were the police making the two arrests. Maurice then heard a voice behind him say, "what you said, motherfucker?" He turned around to find Bergert several feet away from him, with his taser drawn. Believing the taser to be a gun, Maurice claims that he raised his hands and took a step backward toward the club's entrance. Under Maurice's version of events, neither Bergert nor any officer instructed him to disperse, and he did not make any menacing gestures toward Bergert.

At this point, according to Maurice, Bergert fired his taser at Maurice, causing the taser's probes to lodge in his torso and to release an electric shock. Maurice did not fall down after this first shock. He claims that his knees locked

_____

[4] There appears to have been a third arrest of another person associated with the female partygoer. The record is not clear whether this happened before or after the incident between Maurice and the Defendants.

5

up, and he stood "frozen."[5] Williams's sworn declaration suggests that he observed this encounter.[6] Maurice received a second shock when Williams fired his taser probes into Maurice's torso.[7] After this second shock, Maurice fell to the ground. He claims that he did not resist any officer's attempts to handcuff him. Once on the ground, however, Maurice claims that Bergert put his knees on Maurice's back and applied a contact tase to the back of his neck, "grinding" the taser and saying "you motherfucker, you motherfucker." He was then handcuffed and led away from the club.

The Defendants provide a substantially different account of the events surrounding Maurice's arrest. Bergert's police report states that he approached Maurice because he was "yelling and attempting to incite a crowd by yelling 'fuck

---

[5] This characterization implies that he did not make any threatening gestures to any officer after Bergert tased him.

[6] Williams's affidavit states that he "observed [Maurice] struggling with Officer Bergert," and that "[e]ven after being tased, Mr. Maurice was still able to struggle with Officer Bergert." These quotes suggest that Williams observed Maurice's initial encounter with Bergert: the "struggling," as he described it. Because we must accept the facts in the light most favorable to Maurice, we must infer that Williams observed the encounter as Maurice described it.

[7] There is some disagreement in the record about when Williams fired his taser at Maurice. Cineus's deposition at times asserts that Maurice was already down on the ground when Williams fired his taser. This disagreement is not material.

Fils also stated in her deposition that Maurice was "yelling" at the officers after he was tased. It is unclear if that occurred before Williams tased him, after he fell to the ground, or after he was handcuffed. Maurice asserts that he did not yell at the police. Therefore, reviewing the evidence in the light most favorable to the Plaintiffs, we presume that Maurice was not yelling at the officers.

6

that, you cops ain't right.'" Bergert's report asserts that this action, combined with the twenty-to-thirty-person crowd, caused a security concern. Bergert claims that he then ordered Maurice to leave the area. Maurice refused and yelled more obscenities at Bergert, who then told Maurice that he was under arrest. According to Bergert, Maurice did not comply, and instead "took a fighting stance" against him. It was at this point that Bergert fired his taser into Maurice's chest. The Defendants claim that Maurice continued to struggle—"swinging his arms"—after this initial tasing, and Williams assisted Bergert by firing his taser at Maurice. Even on the ground, Bergert claims that Maurice continued to resist arrest, at which point he applied his contact taser.

The witness Cineus provides yet a third version of these events. She claims that Bergert issued several dispersal orders to Maurice. She agreed that Maurice did not obey those orders, but stated that Maurice could not obey them because the entrance to the club was blocked, thus depriving him of his one path away from the parking lot. According to Cineus, Maurice was not violent and responded to Bergert's orders by saying, "Wait, wait. I'm on your side. I'm with you guys. Wait, listen, listen." After Bergert's initial tasing, Cineus describes Maurice as "fighting," but only in the sense that he was "still trying to hold himself."

2.

With Maurice on the ground and under arrest, the events regarding Fils's encounter with the Defendants are also disputed. Undisputed, however, is that the crowd became more agitated after Maurice's arrest. Fils stated that several members of the fifteen-person crowd were shouting at the police, she being one of them.

According to her deposition, Fils was standing several feet from Maurice during his tasering and arrest. Fils agrees with the Defendants that, while Maurice was on the ground, and Bergert was making the arrest, Fils stood behind Bergert, with Bergert's back to Fils. As Maurice hit the ground, Fils began yelling at Bergert, telling him to let Maurice go and that Maurice did not do anything wrong. This verbal incident lasted for approximately thirty seconds.

During her yelling, Fils admits that she took a step forward toward Bergert's back. She asserts, however, that she never made physical contact with Bergert or any other officer. Sometime after this step—the precise moment this step occurred remains unclear—Fils was knocked to the ground by Burns. Knocked unconscious when she hit the ground, Fils does not remember if Bergert applied any force to her. She was then arrested and led from the parking lot.

The Defendants present a different version of Fils's arrest. They claim that Fils jumped on Bergert from behind after Maurice had been subdued. Fils then

8

repeatedly struck Bergert in the head. The Defendants' statements and reports suggest that Bergert administered a contact tase to Fils's upper chest, which enabled Burns to bring her to the ground and make the arrest.

Again, the witness Cineus provided a slightly different version of events. She agreed that, following Maurice's tasing, Fils was yelling at the officers to get off of Maurice, and that Fils advanced toward Bergert's back. Cineus did not state, however, that Fils jumped on Bergert's back. Instead, Fils only made physical contact with the officers when she attempted to push her way into the "little huddle" that the officers had formed around Maurice. It was then that the officers reacted to Fils.

Maurice was charged with disorderly conduct and resisting arrest without force. The State dropped the charges against Maurice after he agreed to pay a fine, enroll in anger management classes, and perform community service. Fils was charged with disorderly conduct, resisting arrest with force, and battery of a law enforcement officer. Fils's case went to trial and she was acquitted of the charges.

B.

The Plaintiffs initially filed a complaint on August 19, 2005, in the United States District Court for the Southern District of Florida. They amended the complaint several times, culminating in a fourth amended complaint (the

9

"Complaint"), filed on July 6, 2007. The Complaint raised twenty-four counts. Counts I through IV alleged false imprisonment claims against the six officers and the City on behalf of Fils and Maurice. Counts V through XVI brought claims under 42 U.S.C. § 1983, alleging that the six officers had deprived Fils and Maurice of, among other things, "the right to be free from unreasonable seizure." The district court interpreted these twelve counts to allege an unreasonable seizure in violation of the Fourth Amendment because the officers used excessive force against Fils and Maurice.[8] Counts XVII through XX alleged that police chief Thomas Ribel and the City should be liable under § 1983 for failure to screen and train properly new police hires. Counts XXI and XXII alleged that all six police officers were liable for malicious prosecution under Florida law. Counts XXIII and XXIV alleged state law battery claims against the six officers.[9]

The Defendants filed motions for summary judgment in September 2008 under Federal Rule of Civil Procedure 56, arguing, among other things, that they

[8] The district court articulated its understandings in its order of August 23, 2010, on limited remand from this court (the "Order on Remand"). The Fourth Amendment to the United States Constitution is applicable to the States pursuant to the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[9] The Complaint alleged jurisdiction based on 28 U.S.C. §§ 1331 and 1343 for the federal § 1983 claims, and 28 U.S.C. § 1367 for the state law claims.

were due qualified immunity.[10]  During that same period, the Defendants filed a

Statement of Material Facts as required by one of the Southern District of Florida's

local rules (the "Local Rules") and also filed supporting affidavits to substantiate

their purported facts.  The Plaintiffs did not swiftly respond, and the district court

granted them an extension of time; their materials would be due on December 4,

2008.  The Plaintiffs filed their response briefs by that deadline.  But these briefs

did not contain the required citations to the record, nor did the Plaintiffs file any

supporting affidavits until December 8.  The Plaintiffs also did not separately file a

Statement of Material Facts, but rather included a section in their briefs purporting

to satisfy that requirement.  The Defendants filed their reply briefs on December

15.  Then, on December 24, without leave of the court or consultation with the

Defendants, the Plaintiffs struck their December 4 response briefs and replaced

them with briefs containing more extensive record citations.  The Defendants

moved to strike these new filings.  The Plaintiffs then submitted additional

documents in support of their response briefs on January 26, 2009, including

transcripts of Fils's criminal trial.[11]

---

[10]  At the district court's instruction, the Defendants filed consolidated motions in October 2008.

[11]  The Plaintiffs also electronically filed exhibits on February 10, 2009, that were not included in previous electronic filings.  The district court's Order on Remand indicated that these papers were filed in paper form on or around December 8, 2008.

On January 28, 2009, the district court entered an order on the summary judgment motions. This order did address the Defendants' motion to strike the December 24 briefs. Although the court chastised the Plaintiffs for their incomplete and tardy filings, the court tersely concluded, without analysis, that "significant fact disputes [exist] that preclude resolving this case under Rule 56." It therefore denied the Defendants' motions for summary judgment based on qualified immunity on every count.

The Defendants appealed. On June 29, 2010, we issued an unpublished opinion vacating the district court's ruling and remanding the case, while retaining jurisdiction. Our opinion first noted that the Plaintiffs' actions surrounding their response to the Defendants' motions for summary judgment violated the Local Rules and aspects of the Federal Rules of Civil Procedure. We then instructed the district court to take the following actions: (1) inform us whether it considered any of the Plaintiffs response briefs or evidence filed after the December 4, 2008 deadline; and (2) if it did rely on any of these documents, to enter a comprehensive order identifying the constitutional basis of the Plaintiffs' § 1983 claims and expressly set out the facts it relied upon to deny the Defendants qualified immunity.

On August 23, 2010, the district court answered our questions in a thorough opinion. The court explained that it had considered the Plaintiffs' revised papers submitted after the December 4 deadline because the filings "were almost exactly the same as the original versions from December 4." Order on Remand 1 n.1. That same footnote also indicated that the court relied on evidence submitted after the deadline.

The court then revised its rulings on the Defendants' qualified-immunity defenses. It granted summary judgment on all relevant counts to the City, Chief Riebel, and three of the officers: Arango, Goranitis and Carlantone. The Plaintiffs filed an untimely notice of appeal of this revised ruling, and we will not review the district court's conclusion regarding these defendants.

The district court again denied Bergert's, Burns's, and Williams's motion for summary judgment based on qualified immunity to the Plaintiffs' excessive force claims. Bergert's and Williams's treatment of Maurice was, according to the district court, excessive and unreasonable. Both officers tased Maurice, first Bergert, and then Williams. Regarding Bergert, the district court applied the three factors set forth in Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989), and found (1) that Maurice was not arrested for a serious crime; (2) that Maurice did not pose an immediate threat to anyone's safety; and

13

(3) that "under Maurice's account of the facts, he was cooperative, was not resisting arrest, not attempting to flee, and never disobeyed any direct orders." The district court emphasized that "Maurice's crime consisted (at most) of disobeying a general disbursal [sic] order and uttering an obscenity, he was not given verbal warnings or direct instructions before he was tased, he posed no specific threat to anyone, and there were numerous police officers on the scene." Bergert's decision to tase Maurice was therefore unreasonable.

According to the evidence most favorable to Maurice, Williams's decision to tase Maurice, and his failure to prevent Bergert from "grinding his taser into Maurice's neck and applying a contact tase" constituted excessive force. This version of the facts suggests that Williams fired a second taser probe into Maurice's rib cage either when he had tensed up following Bergert's initial tase or after Maurice had fallen to the ground. In either case, the district court found that Williams should have known that tasing Maurice violated his Fourth Amendment rights.

Burns and Bergert were also denied qualified immunity for Fils's excessive force claim. According to the facts in Fils's favor, she began yelling at the police in a non-threatening manner after they tased Maurice. Burns then "slammed [Fils] into the ground hard enough to knock her unconscious." This use of force was

14

unreasonable, according to the district court: "[T]he fact that she did not physically touch any of the policemen the whole time was strong evidence that she was all bark and no bite. A reasonable policeman would have warned Fils—or at least attempted to do so—before resorting to significant force."

Police reports also demonstrated that Bergert applied a contact tase to Fils at some point after Burns tackled her. Although Fils presented no evidence regarding Bergert's conduct, the district court relied on the police reports submitted by the Defendants and inferred that perhaps "Bergert tased her after she lost consciousness."

The district court noted the dearth of pre-existing precedent condemning tasers in these circumstances. It noted, however, that other precedential cases dealt with other non-lethal forms of force—attack dogs and pepper spray, specifically—in similar circumstances. The court therefore found that the Defendants should have been on notice that using force in this manner was unconstitutional.

The district court also denied Bergert's, Burns's, and Williams's motions for summary judgment regarding the Plaintiffs' state-law battery claims. The Defendants asserted a state-law defense similar to qualified immunity that absolves police officers from excessive force claims when the officer "reasonably believes

15

the force to be necessary to defend himself or another officer from bodily harm while making the arrest." Order on Remand at 48 (citation omitted). Summary judgment was inappropriate for these counts because, as with the federal excessive force claims, issues of fact existed regarding the propriety of the Defendants' use of force against the Plaintiffs.[12]

These three officers appealed the Order on Remand.[13] We have jurisdiction. Hadley v. Gutierrez, 526 F.3d 1324, 1328–29 (11th Cir. 2008).

## II.

Before addressing the merits, we must address three preliminary issues raised by the Defendants. The first two issues concern whether the district court abused its discretion by indulging the Plaintiffs in their dilatory practices during summary judgment briefing. The third issue addresses whether Fils abandoned her excessive force claim against Bergert.

## A.

---

[12] Following the district court's Order on Remand, the following claims remain at issue: Fils's excessive force claims against Bergert and Burns (Counts V and VII, respectively); Maurice's excessive force claims against Bergert and Williams (Counts XI and XIII, respectively); Fils's battery claim against Bergert and Burns (Count XXIII); and Maurice's battery claim against Bergert and Williams (Count XXIV).

As noted above, the Plaintiffs filed a defective notice of appeal of the district court's Order on Remand. We therefore will not address the Plaintiffs' other claims, and Ribel, the City, Carlantone, Goranitis, and Arango are hereby dismissed from this action.

[13] The Plaintiffs filed a supplemental brief to this court several days after the deadline we set for filing such briefs. The Defendants moved to strike this brief, and we granted their motion.

The Defendants first complain that the Plaintiffs did not submit a valid Statement of Undisputed Facts with their brief opposing summary judgment, as required by Local Rule 7.5(b).[14] Instead, the Defendants allege, the Plaintiffs inserted within each of their briefs a section purporting to satisfy the Local Rule. This statement of facts did not, according to the Defendants, satisfy the requirements of Local Rule 7.5(c) because the Plaintiffs' factual assertions were neither accompanied by specific references to record materials, nor organized in

---

[14] The pertinent portion of Local Rule 7.5 reads:
RULE 7.5 MOTIONS FOR SUMMARY JUDGMENT
. . . .
(b) Opposition Papers. The papers opposing a motion for summary judgment shall include a memorandum of law, necessary affidavits, and a single concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.
(c) Statement of Material Facts. The statement of material facts submitted either in support of or in opposition to a motion for summary judgment shall:
    (1) Not exceed ten (10) pages in length;
    (2) Be supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court; and
    (3) Consist of separately numbered paragraphs.
Statements of material facts submitted in opposition to a motion for summary judgment shall correspond with the order and with the paragraph numbering scheme used by the movant, but need not repeat the text of the movant's paragraphs. Additional facts which the party opposing summary judgment contends are material shall be numbered and placed at the end of the opposing party's statement of material facts; the movant shall use that numbering scheme if those additional facts are addressed in the reply.
(d) Effect of Failure to Controvert Statement of Undisputed Facts. All material facts set forth in the movant's statement filed and supported as required by Local Rule 7.5(c) will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record.

17

numbered paragraphs to correspond with the scheme used by the Defendants. According to the Defendants, the district court abused its discretion by (1) considering the Plaintiffs' defective Statement of Material Facts, and (2) failing to hold that the Plaintiffs' defective submission effectively admitted to the facts as set out in the Defendants' Statement of Material Facts. See Local Rule 7.5(d). Such a concession would have impacted the case; if the Plaintiffs admitted to the facts as laid out by the Defendants, summary judgment would likely have been proper.

We find, however, that the district court did not abuse its discretion. Local rules such as these are "designed to help the court identify and organize the issues in the case." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). As such, "we 'give great deference to a district court's interpretation of its local rules.'" Reese v. Herbert, 527 F.3d 1253, 1267 n.22 (11th Cir. 2008) (quoting Quick v. People's Bank of Cullman Cnty., 993 F.2d 793, 798 (11th Cir. 1993) (brackets omitted)). Although the Plaintiffs' submissions did not comply with the letter of the Local Rule, its submission was sufficient for the district court, which is good enough for this court. See Atwater v. Nat'l Football League Players Ass'n, 626 F.3d 1170, 1175 n.5 (11th Cir. 2010) (deferring to the district court's judgment that the non-moving party's Statement of Material Facts satisfied the local rule); cf.

18

Reese, 527 F.3d at 1270 ("[T]he court essentially overlooked [the plaintiff's] noncompliance with [an identical local rule]—which it had broad discretion to do . . . ." (emphasis added)).

B.

The Defendants also contend that the district court abused its discretion by considering any of the Plaintiffs' evidence, which they submitted in paper on December 8, four days after the filing deadline. They claim that they were prejudiced by this tardy submission, and that these documents should not have been considered.

The Defendants cite several cases from the courts of appeals holding that a district court's strict adherence to a filing deadline is not an abuse of discretion. E.g., Young v. City of Palm Bay, Florida, 358 F.3d 859, 863–64 (11th Cir. 2004). These cases, however, do not support their argument. It is one thing to affirm a district court's action as being within its discretion. It is another thing entirely to find that an action fell outside the district court's sound discretion. Discretion necessarily entails flexibility and autonomy; the district court does not abuse its discretion simply because the appellate court would have handled the issue differently. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400–01, 110 S. Ct.

2447, 2458, 110 L. Ed. 2d. 359 (1990). These cases therefore tell us nothing of the district court's power to be lenient to tardy plaintiffs.

A case cited by the Defendants, Hargett v. Valley Federal Savings Bank, 60 F.3d 754 (11th Cir. 1995), actually suggests that the district court did not abuse its discretion in this case. In Hargett, the district court allowed the defendant to amend its answer to include a new defense four days before the pre-trial conference. Id. at 762. This court found that the district court did not abuse its discretion because the plaintiffs were aware of this defense from the defendants' actions in earlier stages of the litigation. Id. at 763.

Similarly, the Defendants cite a case from the First Circuit that undercuts their argument. In Cia. Petrolera Caribe, Inc., v. Arco Carribean, Inc., 754 F.2d 404 (1st Cir. 1985), the defendants moved for summary judgment and, on the day scheduled for a hearing on that motion, the defendants filed a reply brief and supporting documents containing new evidence, id. at 409. The district court considered this late brief and evidence, but did not give the plaintiffs an opportunity to respond to these filings. Id. at 409–10. The court of appeals found that these actions constituted an abuse of discretion, not because the district court overlooked a filing deadline, but because the late filing deprived the plaintiffs of an opportunity to rebut newly proffered evidence. Id.

20

Measured against this precedent, the district court did not abuse its discretion. Unlike the aggrieved party in Cia. Petrolera Caribe, the Defendants already possessed the depositions of Fils and Maurice in connection with this civil case.[15] In fact, excerpts from these depositions were included as supporting material in their motion for summary judgment. Therefore, the Defendants cannot argue that they were surprised by the existence of these documents. If surprise was the form of their prejudice, the Defendants should have moved to extend the deadline to file their reply briefs.[16] This brief delay is not sufficient to find an abuse of discretion; we have affirmed a lower court's discretion to extend filing deadlines far beyond the four days at issue here. See In re Recile, 496 F.2d 675, 680–81 (5th Cir. 1974) (concluding that a bankruptcy referee did not abuse its discretion by allowing a corporation controlled by the bankrupt to file an objection two and one half years after the filing deadline).[17] We therefore conclude that the

---

[15] We note that the Plaintiffs' December 8 submissions included depositions taken in connection with Fils's criminal trial. The district court, in its Order on Remand, did not rely on these depositions, and instead relied on the Plaintiffs depositions taken in connection with this case. Therefore, whether the district court should have excluded the depositions from the criminal case is irrelevant to this discussion.

[16] The Defendants' real complaint appears to exist not in the district court's consideration of the documents filed on December 8, but rather the fact that the Plaintiffs' Statement of Material Facts did not comply with Local Rule 7.5. This complaint was discussed in part II.A, supra.

[17] The Eleventh Circuit adopted as binding precedent all holdings of the Fifth Circuit prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

21

district court did not abuse its discretion by considering the depositions filed on December 8.[18]

## C.

Finally, the Defendants contend that the district court should have granted Bergert's qualified immunity defense against Fils because Fils never alleged that Bergert applied a contact tase—or applied any excessive force—in any of her filings in the district court. To prevail on a particular theory of liability, a party must present that argument to the district court. See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1325 (11th Cir. 2000) (finding that the plaintiffs abandoned a claim because they did not present the argument to the district court). Our adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."); cf. Common Cause/Georgia v. Billups, 554 F.3d 1340, 1352 (11th Cir. 2009) ("'[A] court must identify and evaluate the interests put forward by the State as

---

[18] The Defendants also argue that the district court abused its discretion by considering the transcript of Fils's criminal trial, even though it did not meet the relevant requirements under the Federal Rules of Civil Procedure. We need not address this issue because the district court did not rely on this transcript in denying the Defendants' qualified immunity claims.

justifications for the burden imposed by its rule, and then make the "hard judgment" that our adversary system demands.'" (quoting Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 190, 128 S. Ct. 1610, 1616, 170 L. Ed. 2d 574 (2008))).

Here, the district court denied Bergert qualified immunity with respect to Fils's excessive force claim because Bergert's taser report—and his sworn affidavit—indicated that he applied a contact tase to Fils. But at no point during the litigation did Fils ever allege (1) that Bergert tased her or (2) that such tasing formed the basis of her lawsuit against Bergert. The Complaint never alleged that Bergert applied a contact tase; its only relevant factual allegation regarding Fils's excessive force claim reads: "Officers Burns and/or Goranitis and/or Arango, grabbed Plaintiff Fils, lifting her up and slamming her head first to the pavement." Complaint ¶ 27. Her response brief to the Defendants' motion for summary judgment and her brief to this court were similarly silent regarding Bergert's conduct towards Fils.

The district court appears to have read Fils's excessive force allegations broadly and presumed that Bergert's contact tase occurred when Fils allegedly lost consciousness. To do so was inappropriate. A district court may look at all the evidence in the record to determine whether issues of material fact exist regarding

23

the plaintiff's asserted causes of action.  It may <u>not</u>, however, act as a plaintiff's

lawyer and construct the party's theory of liability from facts never alleged,

alluded to, or mentioned during the litigation.  Fils never based her excessive force

claim on Bergert's contact tase, and the district court should not have pled her case

for her.  The district court therefore erred by denying summary judgment to

Bergert for Fils's excessive force claim.[19]

None of the law cited by our concurring colleague casts doubt upon this

conclusion.  Federal Rule of Civil Procedure 54(c) concerns itself with "the <u>relief</u>

to which each party is entitled, even if the party has not demanded that <u>relief</u> in its

pleadings." (emphasis added).  Relief is synonymous with remedy, not the entire

cause of action and the facts underlying the cause of action.  <u>See</u> <u>Mungin v. Fla. E.</u>

<u>Coast Ry. Co.</u>, 416 F.2d 1169, 1175 (5th Cir. 1969) (holding that, under Rule

54(c), a demand for a "money award" does not bar the district court's award of

"back pay"); 10 Charles A. Wright et al., <u>Federal Practice & Procedure</u> § 2664, at

180–81 (3d ed. 1998) ("The question is not whether the plaintiff has asked for the

proper <u>remedy</u>, but whether plaintiff is entitled to any <u>remedy</u>." (emphasis added)).

---

[19] Fils also alleged that Bergert committed a state-law battery.  The district court denied Bergert's motion for summary judgment on this count based on its contemporaneous ruling denying Bergert qualified immunity.  Implicitly, then, the district court's ruling on the battery claim was premised on Bergert's contact tase of Fils.  The logic of our discussion above applies with equal force to this battery claim, and we also find that Fils abandoned this claim.

The cases cited by our colleague likewise do not hold that a district court may construct a plaintiff's theory of liability from facts that the plaintiff never alleged. Olson v. Superior Pontiac-GMC, Inc., 777 F.2d 265 (11th Cir. 1985), comes closest to this proposition. On rehearing, the panel opinion addressed the defendant-appellee's argument that the original panel opinion improperly considered an argument never raised by the district court or the parties, both in the district court and on appeal—that the employer did not meet the record keeping requirements of the Fair Labor Standards Act. Id. at 266. The panel's broad wording reads: "In determining an issue in a case, we are not pretermitted by the district court or counsel from considering the record, the statute, case law, and regulations." Id. at 266–67. In context, however, this statement does not yield the radical application to this case that the concurrence suggests. In Olson, the plaintiff alleged that he was paid below the minimum wage. Olson v. Superior Pontiac-GMC, Inc., 765 F.2d 1570, 1571–72 (11th Cir. 1985), modified on reh'g by 776 F.2d 265. The case turned on whether the employer maintained a weekly or monthly pay plan; if the employer kept a weekly plan, it was liable (the plaintiff's position), but was not liable if it kept a monthly plan (the employer's position). Id. at 1576. To resolve this conflict, the court first determined that the employer bears the burden of proving the duration of a pay period. Id. at 1575. It

was in the process of this inquiry that the court raised sua sponte the Act's recordkeeping requirements; the employer's records were such that the court could not determine whether it used a weekly or monthly plan, and therefore the employer could not meet its burden of proof. Id. at 1577–58. Thus, the Olson court's actions were a far cry from the district court here. The recordkeeping requirements were an issue relevant to the plaintiff's factually-pled claim; the Olson court did not concoct factual allegations on the plaintiff's behalf.

The other civil cases likewise do not hold that courts may allege facts on the plaintiff's behalf. In Hassan v. United States Postal Service, 842 F.2d 260 (11th Cir. 1988), the district court did not create a theory of liability for one of the parties; it merely allowed the defendant to raise an affirmative defense at trial that had not been asserted in its pleadings. Id. at 263. Language from Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), is similarly inapplicable because a district court's power to render summary judgment sua sponte stems from the court's interest in judicial economy, and not from its purported power to allege facts on a party's behalf. See 10A Wright et al., supra, § 2720, at 345 ("To [prevent district courts from acting sua sponte] would result in unnecessary trials and would be inconsistent with the objective of [Federal Rule of Civil Procedure] 56 of expediting the disposition of cases.").

26

And the two habeas corpus cases cited present legal issues unique to the habeas context. Day v. McDonough, 547 U.S. 198, 126 S. Ct. 1675, 164 L. Ed. 2d 376 (2006), was a case under 28 U.S.C. § 2254 in which the district court sua sponte raised, on the State's behalf, the one-year statute of limitations under 28 U.S.C. § 2244(d). 547 U.S. at 201–02, 126 S. Ct. at 1679. Such action is inapplicable to private civil litigation because the States' procedural defenses in habeas cases "implicate values beyond the concerns of the parties," id. at 205, 126 S. Ct. at 1681, such as "comity, finality, and the expeditious handling of habeas proceedings," id. at 208–09, 126 S. Ct. at 1683 (describing the State's argument, with which the Court agreed). The other case, Thomas v. Crosby, 371 F.3d 782 (11th Cir. 2004), dealt with the power of courts of appeals to grant certificates of appealability in habeas cases. In Thomas, the petitioner filed a pro se petition under 28 U.S.C. § 2241, but the magistrate judge sua sponte interpreted it as a petition under 28 U.S.C. § 2254. Id. at 784. This court then sua sponte granted a certificate of appealability on whether this was proper, even though the petitioner never raised the issue before the district court or on appeal. Id. at 784–85; id. at 791–92 (Tjoflat, J., specially concurring). Again, this sort of sua sponte action is wholly different than what the district court did here. First, the special concurrence noted that the district courts unquestionably have the power to grant certificates of

27

appealability sua sponte, Thomas, 371 F.3d at 797 (Tjoflat, J., specially concurring); Rule 11(a), Rules Governing § 2254 Cases in the U.S. District Courts; applying that power to the courts of appeals was a minor leap, Thomas, 371 F.3d at 798–800 (Tjoflat, J., specially concurring). Second, Thomas dealt with a pro se litigant, to whom courts are more generous than if they were represented by counsel. See, e.g., United States v. Ly, No. 09-12515, slip op. at 18–20 (11th Cir. July 20, 2011). And finally, the issue in Thomas was one of law; reviewing the sua sponte actions of the magistrate judge is very different than permitting the district court to allege facts on a party's behalf.

## III.

Remaining for our discussion are Maurice's excessive force claims against Bergert and Williams, and Fils's excessive force claim against Burns. The district court denied the Defendants' motions for summary judgment based on qualified immunity. We review this decision de novo. Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010). Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where the moving party—here, the Defendants—"shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). To determine whether the Defendants are entitled to judgment as a matter of law, we accept the Plaintiffs' version of the facts and draw all justifiable inferences in their

28

favor. Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010) (per curiam).

We analyze the Defendants' qualified-immunity defense under a two-part framework.[20] First, we determine whether the Plaintiffs' allegations, and the evidence viewed in their favor, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 200–02, 121 S. Ct. 2151, 2155–56, 150 L. Ed. 2d 272 (2001). Second, that constitutional right must be "clearly established," such that a reasonable officer should have known that his conduct violated the plaintiff's constitutional rights. Id. "Both elements must be satisfied for an official to lose qualified immunity." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1254 (11th Cir. 2010). These two steps do not have to be analyzed sequentially; if the law was not clearly established, we need not decide if the Defendants actually violated the Plaintiffs' rights, although we are permitted to do so. Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009) (citing Pearson v. Callahan, 555 U.S. ____, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009)). We first address whether the Plaintiffs have established a constitutional violation. Finding that Maurice has, and that Fils has

---

[20] The antecedent question for qualified immunity is whether the officer was "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1254 n.19 (11th Cir. 2010) (citations and internal quotations omitted). The Plaintiffs do not claim that the Defendants were acting outside their discretionary authority.

29

not, we then inquire whether the law regarding Maurice's claim was clearly established; we hold that it was.

A.

The Plaintiffs' excessive force claims arise from the Fourth Amendment's protection "against unreasonable . . . seizures." Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989). An officer's use of force is excessive under the Fourth Amendment if the use of force was "objectively [un]reasonable in light of the facts and circumstances confronting" the officer. Id. at 397, 109 S. Ct. at 1872 (citations and internal quotation marks omitted). Reasonableness is "judged from the perspective of the reasonable officer on the scene" without the benefit of hindsight. Id. at 396, 109 S. Ct. at 1872. This standard "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97, 109 S. Ct. at 1872.

Reasonableness cuts both ways, however. At summary judgment, we cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party, and determine whether the officer's use of force was excessive under those circumstances. See

30

Vinyard v. Wilson, 311 F.3d 1340, 1347–48 (11th Cir. 2002) (evaluating, at summary judgment, the allegedly excessive force under the facts as described by the plaintiff, notwithstanding the defendant-officer's different version of events).

When determining whether the force used to make an arrest was reasonable for purposes of the Fourth Amendment, "a court must carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1305 (11th Cir. 2009) (quoting Graham, 490 U.S. at 396, 109 S. Ct. at 1871). Officers may use force that is "necessary in the situation at hand." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) (quotations omitted). And we evaluate whether force was necessary by examining: "'(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Brown v. City of Huntsville, Ala., 608 F.3d 724, 738 (11th Cir. 2010) (quoting Vinyard, 311 F.3d at 1347); see also Graham, 490 U.S. at 396, 109 S. Ct. at 1872 (referring to these same factors).

1.

These are the facts relevant to Maurice's claim, viewed in the light most favorable to him. Following the arrest of the female partygoer and her friend, the

31

crowd outside the club was not rowdy, but rather was "calm." Maurice had his back turned to the parking lot—and to the group of police officers—and was having a conversation with the promoter. During that conversation, Maurice told the promoter that he thought that "they're overreacting, these motherfuckers are overreacting"—"they" presumably meaning the police. Having overheard Maurice, Bergert walked up to Maurice's back and said, "what you said, motherfucker?," and pulled out his taser. Maurice turned around, saw Bergert's weapon, put his hands up, and took one step backward. Without any verbal warning, Bergert shot his taser into Maurice's chest and delivered an electric shock.

Williams claimed to have observed this initial interaction, and a reasonable inference is that he saw and heard what Bergert saw and heard. Maurice did not fall down following Bergert's initial tasing, but he did not swing his arms or in any other way resist arrest. Nonetheless, Williams shot his taser probes into Maurice's chest. And, after finally falling to the ground, Bergert put his knee in Maurice's back and grinded his contact taser into the back of Maurice's neck while saying, "you motherfucker, you motherfucker." After the incident, Maurice was charged with resisting arrest without force and disorderly conduct.

Under these circumstances, Bergert's and Williams's use of force was excessive. Measuring these facts against the three factors from Graham, supra, demonstrates the obviousness of this conclusion. First, the crime for which Maurice was arrested was not serious. Disorderly conduct is not a serious offense. Vinyard, 311 F.3d at 1347. Similarly, resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force.

Second, Maurice clearly did not present a threat to Bergert's safety, or to the safety of anyone else. According to Maurice, he was merely having a private conversation before Bergert approached him, taser drawn. When he saw the taser, Maurice put his hands in the air and took a step away from Bergert. And, because Bergert issued no warnings or directives to move, Maurice clearly did not disobey any orders. After Bergert's initial tase, Maurice did not attempt to attack Bergert or Williams, but Williams nonetheless fired his taser.

Third, Maurice was not resisting arrest or attempting to escape. Although he was charged with resisting arrest, Maurice's version of events shows that he did not ignore any verbal instructions, nor did he attempt to free himself from Bergert's control once he was on the ground.

Our conclusion is in line with other excessive force cases from this court. Put together, these cases establish that unprovoked force against a non-hostile and

33

non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment.

For example, in Vinyard, the plaintiff was arrested by the defendant-officer for disorderly conduct and obstructing a law enforcement officer. 311 F.3d at 1344. The defendant-officer handcuffed the plaintiff and sat her in the back seat of his patrol car, which had a plexiglass screen between the front and back seat. Id. at 1343. During the ride from the scene to the police station, the plaintiff and defendant-officer exchanged verbal abuse. Id. Tired of that abuse, the defendant-officer pulled the car to the side of the road, exited the vehicle, opened the door to the back seat, pulled the plaintiff by the hair, and sprayed her in the eyes with pepper spray. Id. This court noted that the plaintiff's crime was minor, she did not pose a threat to anyone, and there was no indication that she resisted arrest or attempted to flee. Id. at 1347–48. It therefore concluded that the defendant-officer's use of pepper spray was "plainly excessive, wholly unnecessary, and indeed, grossly disproportionate under [the factors from] Graham." Id. at 1348 (quoting Lee, 284 F.3d at 1198).

Other cases confirm that non-violent suspects, accused of minor crimes, who have not resisted arrest—just like Maurice—are victims of constitutional abuse when police used extreme force to subdue them. In Hadley v. Gutierrez, 526 F.3d

34

1324 (11th Cir. 2008), the defendant-officer used excessive force when he punched the plaintiff in the stomach while the plaintiff was handcuffed and not resisting arrest. Id. at 1330. And, in Priester v. City of Riviera Beach, Florida, 208 F.3d 919 (11th Cir. 2000), the court held that the defendant-officer used excessive force when he released his police dog to attack the plaintiff, who was accused of a minor, non-violent offense, who had obeyed every police command, and who was lying still on the ground when the defendant-officer released his dog. Id. at 923–24. Although none of these cases involved tasers, we see no meaningful distinction under these circumstances. Compare Vinyard, 311 F.3d at 1348 (finding the use of pepper spray to be excessive force even though it is "generally of limited intrusiveness" (quotation omitted)), with Draper v Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (stating that, while a taser shock is "unpleasant," it "did not inflict any serious injury" on the plaintiff).

Of course, the use of tasers or other weapons does not violate the Fourth Amendment per se. Such force could be appropriate where an officer reasonably believes the suspect is violent. See McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244–45 (11th Cir. 2003) (holding that use of pepper spray to a suspect's face was reasonable where the officer had probable cause to believe that the suspect had committed a violent felony and was still armed with a weapon).

And, where a suspect appears "hostile, belligerent, and uncooperative," use of a taser might be preferable to a "physical struggle [causing] serious harm" to the suspect or the officer. See Draper, 369 F.3d at 1278 (approving of an officer's use of a taser against a suspect at a traffic stop who "used profanity, moved around and paced in agitation, . . . repeatedly yelled at" the officer, and did not comply with verbal commands).

But, the facts we must accept show that Maurice was not violent. He did not disobey orders. He did not resist arrest. And he posed no risk to the Defendants or anyone else at the club. Therefore, Bergert's and Williams's tasing violated Maurice's Fourth Amendment rights.[21]

2.

Turning to Fils's claims, the evidence in the light most favorable to her indicates that Burns did not use excessive force. According to Fils's own testimony, the crowd outside the club became significantly more hostile to the

---

[21] The district court also theorized that Williams could be liable for failing to prevent Bergert from grinding his contact taser into Maurice's neck. Nowhere in the Plaintiffs' Complaint, summary judgment papers, or their brief to this court suggested this theory of liability. For the reasons described in part II.C, supra, Maurice cannot recover against Williams on this theory. Moreover, the record is silent as to whether Williams had an opportunity to intervene. This silence is sufficient to preclude liability. See Brown v. City of Huntsville, Ala., 608 F.3d 724, 740 n.25 (11th Cir. 2010) ("Because the relevant events happened so quickly, the record does not reflect any point at which Anderson could have intervened to prevent [the arresting officer's] use of excessive force . . . . Anderson accordingly is not liable for failure to intervene in [the arresting officer's] use of force.").

36

police after Maurice was tased. She was screaming at Bergert, telling him to let Maurice go. At this point, Bergert was arresting Maurice and his back was facing Fils; Bergert would therefore be unable to respond to an attack from Fils. And it was at this point that Fils took a step forward—still screaming—toward Bergert's back.

During Bergert's encounter with Maurice, Burns was assisting one of the other officers with the arrest of the female partygoer and her friend.[22] Burns heard a commotion behind him, turned around, and saw Bergert shoot his taser at Maurice. He did not at that point immediately respond to the scene. It was only after Fils stepped forward to Bergert's back that Burns responded and threw Fils to the ground.[23]

A reasonable officer could easily have seen Fils's step forward to Bergert's back as representing a danger to Bergert. Fils was screaming, and clearly indicated that she was not happy with Bergert. Because Bergert's back was facing Fils, Bergert would likely not be able to defend himself in the event that Fils attacked.

---

[22] The facts regarding Burns's placement are taken from his sworn affidavit. Because the Plaintiffs' deposition testimony tells us nothing of Burns's actions prior to tackling Fils, the Plaintiffs have not disputed these facts.

[23] Burns's affidavit states that he assisted Bergert only after Fils jumped on Bergert's back and began hitting him. Fils denies that she ever touched Bergert, but admits that she stepped toward Bergert's back while she was yelling. Putting their testimony together, the text above meshes the undisputed facts.

37

The danger posed by Fils was exacerbated by the newly-discontented crowd surrounding the officers. Although not vast, the crowd of fifteen to twenty people who may have been drinking—it was 3:00 a.m.—likely compounded the danger posed by Fils's step forward. Given these circumstances, we hesitate to second-guess Burns's "split-second judgment." See Graham, 490 U.S. at 397, 109 S. Ct. at 1872.

Furthermore, the force used here was arguably less than the force we approved of in Draper. There, the defendant-officer tased a motorist who belligerently refused to obey the defendant-officer's instructions. 369 F.3d at 1278. The tasing in that case was acceptable because the defendant-officer could reasonably have calculated that applying handcuffs or issuing a verbal arrest warning "may well have . . . escalated a tense and difficult situation into a serious physical struggle." Id. Here, rather than tase Fils, Burns quickly tackled Fils to the ground. And, he did so not simply to prevent a tense scene from escalating, but rather because he could have reasonably believed that Fils was about to attack Bergert from behind. We therefore conclude that the district court erred and that Burns is entitled to qualified immunity.

B.

We now turn to whether the law relevant to Maurice's excessive force claim against Bergert and Williams was clearly established. To deny their qualified-immunity defenses, the law in August 2003 must have been sufficiently clear to put Bergert and Williams on notice that their conduct violated Maurice's Fourth Amendment rights. See Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002) ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (citation and internal quotations omitted)). We agree with the district court; the law was clear and the Defendants were on notice.

Our circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional. The first method looks at the relevant case law at the time of the violation; the right is clearly established if "a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law." Hadley, 526 F.3d at 1333 (citation and internal quotations omitted). This method does not require that the case law be "materially similar" to the officer's conduct; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741, 122 S. Ct. at 2516. But, where the law is stated in broad propositions, "a very high degree of prior factual particularity may

be necessary." Id. at 740–41, 122 S. Ct. at 2516 (quoting United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227, 137 L. Ed. 2d 432 (1997)).

The second method looks not at case law, but at the officer's conduct, and inquires whether that conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law." Vinyard, 311 F.3d at 1355 (citations and internal quotations omitted). This method—termed "obvious clarity," id.—is a "narrow exception" to the normal rule that only case law and specific factual scenarios can clearly establish a violation, Lee, 284 F.3d at 1198–99. Concrete facts are generally necessary to provide officers' with notice of the "hazy border between excessive and acceptable force." See id. But, where the officer's conduct is so outrageous that it clearly goes "so far beyond" these borders, qualified immunity will not protect him even in the absence of case law. Reese v. Herbert, 527 F.3d 1253, 1274 (11th Cir. 2008) (quoting Priester, 208 F.3d at 926–27).

Under either method, Bergert and Williams should have known that their conduct violated Maurice's Fourth Amendment rights. Maurice was tased even though he committed at most a minor offense; he did not resist arrest; he did not threaten anyone; and he did not disobey any instructions (for none were given).

40

These facts are sufficiently similar to the facts of Priester and Vinyard that these Defendants were on notice that their conduct violated Maurice's rights. In Priester, the defendant-officer set his attack dog on the plaintiff even though the plaintiff had submitted to the defendant-officer's every command and was laying flat on the ground. 208 F.3d at 927. And, in Vinyard, the defendant-officer sprayed pepper spray into the eyes of a non-violent plaintiff, who was handcuffed safely in the back seat of the defendant-officer's police car, and had threatened no one. 311 F.3d at 1347–48. These two cases clearly establish that such force is excessive where the suspect is non-violent and has not resisted arrest. While these cases are not identical to Maurice's case, they need not be "materially similar"; the precedent need only provide the Defendants with "fair warning." Hope, 536 U.S. at 741, 122 S. Ct. at 2516. These cases do just that.

Even if these cases did not exist, the Defendants' conduct would fall under the narrow "obvious clarity" exception described above. The facts as we must accept them show that Maurice showed no hostility to the Defendants, did not disobey any orders, and did not make any menacing gestures. Assuming these facts, no reasonable officer could ever believe that it was appropriate to shoot his taser probes into Maurice and shock him. This line is not hazy, and Bergert's and Williams's actions were clearly wrong. See Reese, 527 F.3d at 1274 ("It is beyond

41

question that the law was 'clearly established' so as to give the defendants fair warning that their actions in such circumstances violated [the plaintiff's] Fourth Amendment rights."). The district court therefore properly denied Bergert's and Williams's motions for summary judgment based on qualified immunity.[24]

## IV.

For the foregoing reasons, we AFFIRM the district court with respect to Maurice's excessive force claims against Bergert and Williams, we REVERSE the district court with respect to Fils's excessive force claims against Bergert and Burns, we AFFIRM the district court's decision to dismiss the remaining claims, and we REMAND the case to the district court for further proceedings.[25]

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[24] We stress that our conclusion is driven by the stark contrast between Maurice's version of events and that of the Defendants. At summary judgment, we must accept Maurice's version of events, and make all reasonable inferences in his favor. At trial, credibility determinations may cause the trier of fact to discount Maurice's version of events, but we may not do so now.

We also note that the district court denied Bergert's and Williams's motion for summary judgment regarding Maurice's state-law battery claim. The Defendants did not brief that issue either in their initial brief to this court or in their supplemental brief following the district court's Order on Remand. The district court will deal with this issue on remand.

[25] Pending before this court is the Defendants' October 15, 2010 motion for direction from this court on how to proceed with this appeal. This motion is moot in light of this opinion.

KORMAN, District Judge, concurring:

I concur in the majority opinion. I write separately with respect to the issue of Fils's excessive force and pendant state law battery claims against Bergert. Briefly, the majority reverses the order denying Bergert's motion for summary judgment because the district judge relied on a theory of liability which Fils did not allege in support of the cause of action against Bergert based on his alleged excessive use of force. Specifically, the district judge relied on evidence supplied by Officer Bergert that he had tased Fils during the course of the encounter with her that led to her arrest.

While the majority recognizes that "[a] district court may look at all the evidence in the record to determine whether issues of material fact exist," it holds that "[t]o prevail on a particular theory of liability, a party must present that argument to the district court." Majority Opinion 23, *citing Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325 (11th Cir. 2000). According to the majority "[o]ur adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties." *Id*. at 23 (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) for the unarguable, although entirely different, proposition that "[t]here is no burden upon the district court to distill every potential argument that could be

43

made based upon the materials before it on summary judgment"). These cases do not support the application of the rule on which the majority relies to the facts of this case. Both of the foregoing cases involved an appeal from an adverse judgment in which a plaintiff sought to raise and obtain a reversal with respect to an issue which had not been raised in the district court. And it was in this context that we declined to consider the issue on the ground that a party cannot generally obtain a reversal on a ground not asserted below. Moreover, even in those circumstances, we have not adopted a hard and fast rule. *See Resolution Trust*, 43 F.3d at 598-99; *see also*, *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004) (we "recognize that a circuit court's power to entertain an argument raised for the first time on appeal is not a jurisdictional one; thus, we *may* choose to hear the argument under special circumstances").

We not only have the discretion to consider arguments raised for the first time on appeal, we have also held that we have the discretion to consider arguments *not* raised either on appeal or in the district court. *Olson v. Superior Pontiac-GMC, Inc.*, 776 F.2d 265, 267 (11th Cir. 1985), a case decided under the Fair Labor Standards Act, is particularly apposite. Passing over a detailed discussion of the legal issues in the case, the defendant-appellee moved for rehearing on the ground, inter alia, "that the panel considered an issue not raised

44

below or on appeal when [it] concluded that the employer's monthly pay period did not meet the recordkeeping requirements of the statute [which was never argued by the plaintiff]." *Id*. at 266. Indeed, the panel engaged in an exercise that the majority in this case holds to be improper, it "act[ed] as plaintiff's lawyer and construct[ed] the party's theory of liability from facts never alleged, alluded to, or mentioned during the litigation." Majority Opinion 25. Nevertheless, in denying the petition for rehearing, the *Olson* panel held that, "[i]n determining an issue in a case, we are not pretermitted by the district court or counsel from considering the record, the statute, case law, and regulations." *Id*. at 267.[1] Moreover, as Judge Tjoflat has observed, "[i]t is beyond dispute that, in general, we have the power to consider issues that a party fails to raise on appeal, even though the petitioner does not have the right to demand such consideration." *Thomas v. Crosby*, 371 F.3d 782, 793 (11th Cir. 2004) (Tjoflat, J., concurring) (internal citations omitted).

[1] Conceding the force of the holding in *Olson*, Majority Opinion 26, the majority argues that "[t]he recordkeeping requirements were an issue relevant to the plaintiff's factually-pled claim; the *Olson* court did not concoct factual allegations on the plaintiff's behalf." Majority Opinion 27. This is a distinction cannot withstand analysis. The critical fact upon which the majority relied on in *Olson*—the failure to comply with the recordkeeping statute—was a factual allegation that did not come from the plaintiff, it was raised *sua sponte.* So too was the legal theory to which those facts were relevant. Moreover, the majority's suggestion that the district judge in the present case "concoct[ed] factual allegations" does a disservice to a conscientious district judge who relied on factual admissions from the defendant Bergert's written report and affidavit as a basis for denying his motion for summary judgment. The facts were directly relevant to Fils's cause of action for excessive use of force, and they were not inconsistent with the allegations in the complaint—the adequacy of which was never challenged. A district judge clearly has the discretion to consider the entire record in ruling on a motion for summary judgment without being accused of "concoct[ing] factual allegations." *See, e.g. Clinkscales v. Chevron USA, Inc*., 831 F.2d 1565, 1570 (11th Cir. 1987).

45

Thus, he continued, "this case ultimately involves a question of our power, not of Thomas's rights or whether he waived them." *Id.*

While there are sound considerations of policy that support the general rule where the appellants failed to alert the district court to arguments that they raise on appeal, those arguments do not apply to a case in which the district court raised and considered the issue *sua sponte*. Nor is there any sound basis for holding that a district court lacks the same discretion that we do to consider an argument not raised by the parties. On the contrary, there is compelling authority for the proposition that it is entirely proper for a district judge to exercise his discretion to consider such an argument that the party adversely affected has sufficient opportunity to be heard on the issue.

Thus, the Supreme Court has held that a district judge is "permitted but not obliged" to *sua sponte* entertain affirmative defenses that have not been raised by the defendant, including the statute of limitations. *See, e.g., Day v. McDonough*, 547 U.S. 198, 210 (2006). We have likewise held that "when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for a trial court to hear evidence on the issue." *Hassan v. U.S. Postal Service*, 842 F.2d 260, 263 (11th Cir. 1988). Moreover, the Supreme Court has observed that "that district courts are widely acknowledged to possess the power to enter summary judgment

*sua sponte*, so long as the losing party was on notice that she had to come forward with all her evidence." *Celotex Corporation v. Catrett,* 477 U.S 317, 326 (1986); *see also,* 10A Wright, Miller and Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998) p. 339 ("The major concern in cases in which the court wants to enter summary judgment without a Rule 56 motion by either party is not really one of power," it is notice to the party against whom it seeks to enter judgment).

The effort of the majority to distinguish *Day* and *Celotex* only serves to confirm that, in an appropriate case, a district judge has the discretion to consider *sua sponte* issues not raised by the parties. Thus, it suggests that "*Day*'s status as a habeas case inherently limits its applicability here because the State's procedural defenses in habeas cases 'implicate values beyond the concerns of the parties,'" Majority Opinion 26, and it suggests that *Celotex* is "inapplicable because a district court's power to render summary judgment *sua sponte* stems from the courts' interest in judicial economy…" *Id*. at 27. Without taking issue with the effort of the majority to explain the rationale for these decisions, they plainly support the proposition that this case ultimately involves an issue of discretion and not of power.

Moreover, additional support for this proposition may be found in the cases construing Fed. R. Civ. P. 54 which expressly provides that every… final judgment

47

should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). As the leading treatise on Federal Practice observes:

> [T]he rule has been used to support the conclusion that the legal theories set out in the complaint are not binding on plaintiff. For example, the Second Circuit granted a priority lien to the United States in a bankruptcy proceeding for unpaid social security and withholding taxes even though the government did not urge the lien before the referee or the district court. And . . . in an action by members of a union under the Railway Labor Act in which only individual damages and back pay were sought, the Fifth Circuit [in a pre-split case] determined that the action also involved a claim for relief on behalf of the entire craft, although not specifically pleaded, and remanded the action for further proceedings, including an award of whatever relief would be appropriate to vindicate those rights.

10 Charles Alan Wright et al., *Federal Practice and Procedure* § 2664, 196 (3d ed. 1998) *citing, inter alia, Mungin v. Florida E. Coast Ry. Co.*, 416 F.2d 1169 (5th Cir. 1969).

Significantly, Rule 54 "has [also] been invoked in conjunction with Rule 56 to support the court's decision to render summary judgment for the nonmoving party on the ground that that result is justified by the evidence. Although the power to render a summary judgment in the absence of a cross-motion generally is recognized as within the authority of Rule 56, itself, those courts referring to Rule 54(c) simply are noting that the policy of the rule to ensure that pleading

48

technicalities do not control what relief ultimately is awarded also supports the court's summary-judgment authority." *Id*.

All this having been said, the procedural posture of this case is troubling. Specifically, the failure of Fils to invoke the theory of liability on which the district court denied summary judgment suggests a deliberate decision rather than inadvertence. Indeed, the failure of Fils to respond to the argument of Officer Bergert on this appeal confirms a deliberate decision by Fils to limit her excessive force cause of action to the claim (which the majority properly rejects) that she was unjustifiably hurled to the ground with a force sufficient to cause her to lose consciousness. Under these circumstances, it is appropriate to consider as abandoned the ground upon which the district court denied the motion for summary judgment. This provides a sufficient basis for reversal without creating a precedent that would deprive the district court of discretion to deny a motion for summary judgment on a ground not argued.